In the Matter of TOLONA PIZZA
PRODUCTS CORPORATION,
Debtor–Appellant.

No. 92–3386.

United States Court of Appeals,
Seventh Circuit.

Argued May 6, 1993.

Decided Aug. 19, 1993.

Daniel A. Zazove, Towbin & Zazove, Chicago, IL, Warren R. Fuller, Karen Arndt Berres, argued, South Barrington, IL, for Rose Packing Co., Inc.

Richard S. Alsterda, argued, Alexis R. Logan, Coffield, Ungaretti, Harris & Slavin, Chicago, IL, for Tolona Pizza Products Corp.

Before POSNER, FLAUM, and RIPPLE, Circuit Judges.

POSNER, Circuit Judge.

■ When, within 90 days before declaring bankruptcy, the debtor makes a payment to an unsecured creditor, the payment is a "preference," and the trustee in bankruptcy can recover it and thus make the creditor take pot luck with the rest of the debtor's unsecured creditors. 11 U.S.C. § 547. But there is an exception if the creditor can show that the debt had been incurred in the ordinary course of the business of both the debtor and the creditor, § 547(c)(2)(A); that the payment, too, had been made and received in the ordinary course of their businesses, § 547(c)(2)(B); and that the payment had been "made according to ordinary business terms." § 547(c)(2)(C). The first two requirements are easy to understand: *of course* to defeat the inference of preferential treatment the debt must have been incurred in the ordinary course of business of both debtor and creditor and the payment on account of the debt must have been in the ordinary course as well. But what does the third requirement—that the payment have been "made according to ordinary business terms"—add? And in particular does it refer to what is "ordinary" between this debtor and this creditor, or what is ordinary in the market or industry in which they operate? The circuits are divided on this question, compare *In re Fred Hawes Organization, Inc.*, 957 F.2d 239, 243–44 (6th Cir.1992), and *WJM, Inc. v. Massachusetts Dept. of Public Welfare*, 840 F.2d 996, 1011 (1st Cir.1988), with *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 499 (8th Cir.1991); *J.P. Fyfe, Inc. v. Bradco Supply Corp.*, 891 F.2d 66, 71 n. 5 (3d Cir.1989), and *In re Craig Oil Co.*, 785 F.2d 1563, 1565 (11th Cir.1986) (per curiam), the scholarly literature inconclusive, 4 *Collier on Bankruptcy* ¶ 547.10 at p. 547–50 (Lawrence P. King 15th ed. 1993); Vern Country-man, "The Concept of a Voidable Preference in Bankruptcy," 38 *Vand.L.Rev.* 713, 772–73 (1985); David J. DeSimone, "Section 547(c)(2) of the Bankruptcy Code: The Ordinary Course of Business Exception Without the 45 Day Rule," 20 *Akron L.Rev.* 95, 123–28 (1986); Lissa Lamkin Broome, "Payments on Long–Term Debt as Voidable Preferences: The Impact of the 1984 Bankruptcy Amendments," 1987 *Duke L.J.* 78, 86, our court undecided, *In re Xonics Imaging, Inc.*, 837 F.2d 763, 766 (7th Cir.1988); *In re Excello Press, Inc.*, 967 F.2d 1109, 1114 (7th Cir. 1992), the bankruptcy judges divided. *Id.*

Tolona, a maker of pizza, issued eight checks to Rose, its sausage supplier, within 90 days before being thrown into bankruptcy by its creditors. The checks, which totaled a shade under $46,000, cleared and as a result Tolona's debts to Rose were paid in full. Tolona's other major trade creditors stand to receive only 13¢ on the dollar under the plan approved by the bankruptcy court, if the preferential treatment of Rose is allowed to stand. Tolona, as debtor in possession, brought an adversary proceeding against Rose to recover the eight payments as voidable preferences. The bankruptcy judge entered judgment for Tolona. The district judge reversed. He thought that Rose did not, in order to comply with section 547(c)(2)(C), have to prove that the terms on which it had extended credit to Tolona were standard terms in the industry, but that if this was wrong the testimony of Rose's executive vice-president, Stiehl, did prove it. The parties agree that the other requirements of section 547(c)(2) were satisfied.

Rose's invoices recited "net 7 days," meaning that payment was due within seven days. For years preceding the preference period, however, Tolona rarely paid within seven days; nor did Rose's other customers. Most paid within 21 days, and if they paid later than 28 or 30 days Rose would usually withhold future shipments until payment was received. Tolona, however, as an old and valued customer (Rose had been selling to it for fifteen years), was permitted to make payments beyond the 21–day period and even beyond the 28–day or 30–day period. The

eight payments at issue were made between 12 and 32 days after Rose had invoiced Tolona, for an average of 22 days; but this actually was an improvement. In the 34 months before the preference period, the average time for which Rose's invoices to Tolona were outstanding was 26 days and the longest time was 46 days. Rose consistently treated Tolona with a degree of leniency that made Tolona (Stiehl conceded on cross-examination) one of a "sort of exceptional group of customers of Rose . . . fall[ing] outside the common industry practice and standards."

It may seem odd that paying a debt late would ever be regarded as a preference to the creditor thus paid belatedly. But it is all relative. A debtor who has entered the preference period—who is therefore only 90 days, or fewer, away from plunging into bankruptcy—is typically unable to pay all his outstanding debts in full as they come due. If he pays one and not the others, as happened here, the payment though late is still a preference to that creditor, and is avoidable unless the conditions of section 547(c)(2) are met. One condition is that payment be in the ordinary course of both the debtor's and the creditor's business. A late payment normally will not be. It will therefore be an avoidable preference.

This is not a dryly syllogistic conclusion. The purpose of the preference statute is to prevent the debtor during his slide toward bankruptcy from trying to stave off the evil day by giving preferential treatment to his most importunate creditors, who may sometimes be those who have been waiting longest to be paid. Unless the favoring of particular creditors is outlawed, the mass of creditors of a shaky firm will be nervous, fearing that one or a few of their number are going to walk away with all the firm's assets; and this fear may precipitate debtors into bankruptcy earlier than is socially desirable. *In re Xonics Imaging, Inc., supra,* 837 F.2d at 765; *In re Fred Hawes Organization, Inc., supra,* 957 F.2d at 243 n. 5.

From this standpoint, however, the most important thing is not that the dealings between the debtor and the allegedly favored creditor conform to some industry norm but that they conform to the norm established by the debtor and the creditor in the period before, preferably well before, the preference period. That condition is satisfied here—if anything, Rose treated Tolona more favorably (and hence Tolona treated Rose less preferentially) before the preference period than during it.

But if this is all that the third subsection of 547(c)(2) requires, it might seem to add nothing to the first two subsections, which require that both the debt and the payment be within the ordinary course of business of both the debtor and the creditor. For, provided these conditions are fulfilled, a "late" payment really isn't late if the parties have established a practice that deviates from the strict terms of their written contract. But we hesitate to conclude that the third subsection, requiring conformity to "ordinary business terms," has no function in the statute. We can think of two functions that it might have. One is evidentiary. *In re Loretto Winery, Ltd.,* 107 B.R. 707, 710 (9th Cir. BAP 1989); *In re Morren Meat & Poultry Co.,* 92 B.R. 737, 740–41 (W.D.Mich.1988); DeSimone, *supra,* at 127–28. If the debtor and creditor dealt on terms that the creditor testifies were normal for them but that are wholly unknown in the industry, this casts some doubt on his (self-serving) testimony. Preferences are disfavored, and subsection C makes them more difficult to prove. The second possible function of the subsection is to allay the concerns of creditors that one or more of their number may have worked out a special deal with the debtor, before the preference period, designed to put that creditor ahead of the others in the event of bankruptcy. It may seem odd that allowing late payments from a debtor would be a way for a creditor to make himself more rather than less assured of repayment. But such a creditor does have an advantage during the preference period, because he can receive late payments then and they will still be in the ordinary course of business for him and his debtor.

The functions that we have identified, combined with a natural reluctance to cut out and throw away one-third of an important provision of the Bankruptcy Code,

persuade us that the creditor must show that the payment he received was made in accordance with the ordinary business terms in the industry. But this does not mean that the creditor must establish the existence of some single, uniform set of business terms, as Tolona argues. DeSimone, *supra*, at 127. Not only is it difficult to identify the industry whose norm shall govern (is it, here, the sale of sausages to makers of pizza? The sale of sausages to anyone? The sale of anything to makers of pizza?), but there can be great variance in billing practices within an industry. Apparently there is in this industry, whatever exactly "this industry" is; for while it is plain that neither Rose nor its competitors enforce payment within seven days, it is unclear that there is a standard outer limit of forbearance. It seems that 21 days is a goal but that payment as late as 30 days is generally tolerated and that for good customers even longer delays are allowed. The average period between Rose's invoice and Tolona's payment during the preference period was only 22 days, which seems well within the industry norm, whatever exactly it is. The law should not push businessmen to agree upon a single set of billing practices; antitrust objections to one side, the relevant business and financial considerations vary widely among firms on both the buying and the selling side of the market.

▮ We conclude that "ordinary business terms" refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C. *In re SPW Corp.*, 96 B.R. 676, 681–82 (Bankr.N.D.Tex.1989); *In re White*, 64 B.R. 843, 850 (Bankr.E.D.Tenn.1986); *In re Economy Milling Co.*, 37 B.R. 914, 922 (D.S.C. 1983). Stiehl's testimony brought the case within the scope of "ordinary business terms" as just defined. Rose and its competitors pay little or no attention to the terms stated on their invoices, allow most customers to take up to 30 days to pay, and allow certain favored customers to take even more time. There is no single set of terms on which the members of the industry have coalesced; instead there is a broad range and the district judge plausibly situated the dealings between Rose and Tolona within it. These dealings are conceded to have been within the normal course of dealings between the two firms, a course established long before the preference period, and there is no hint either that the dealings were designed to put Rose ahead of other creditors of Tolona or that other creditors of Tolona would have been surprised to learn that Rose had been so forbearing in its dealings with Tolona.

▮ Tolona might have argued that the district judge gave insufficient deference to the bankruptcy judge's contrary finding. The district judge, and we, are required to accept the bankruptcy judge's findings on questions of fact as long as they are not clearly erroneous. Fed.R.Bankr.P. 8013; *In re Bonnett*, 895 F.2d 1155, 1157 (7th Cir. 1989). But since Tolona did not argue that the district judge had applied an incorrect standard of review, we need not decide whether the district judge overstepped the bounds. Which is not to say that he did. While he did not intone the magic words "clear error," he may well have believed that the record as a whole left no doubt that Tolona's dealings with Rose were within the broad band of accepted practices in the industry. It is true that Stiehl testified that Tolona was one of an exceptional group of Rose's customers with whom Rose's dealings fell outside common industry practice. But the undisputed evidence concerning those dealings and the practices of the industry demonstrates that payment within 30 days is within the outer limits of normal industry practices, and the payments at issue in this case were made on average in a significantly shorter time.

The judgment reversing the bankruptcy judge and dismissing the adversary proceeding is

AFFIRMED.

FLAUM, Circuit Judge, dissenting.

I agree with the majority that under 11 U.S.C. § 547(c)(2)(C) Rose was required to show that Tolona's payments had been made in accordance with the ordinary business

terms of the industry in order to defeat the inference that the payments were preferential. I respectfully dissent, however, because I cannot conclude that Rose in fact made the requisite showing.[1]

The bankruptcy court discussed in some detail the evidence offered by Rose to show conformity to the standard terms of the industry. As the bankruptcy judge characterized it, what little evidence was offered was ambiguous. One of Rose's salesmen testified that few of Rose's customers paid within the 7-day terms of its contracts but three-quarters paid within 21 days. An accounts receivable clerk testified that most local accounts paid within 14 days. Most importantly, the executive vice-president of Rose, Dwight Stiehl, testified that Tolona's credit practices conformed to industry-wide norms. But, the bankruptcy court pointed out, Stiehl's answer did not explain *which* credit practices of Rose—either the contractual terms that stated "net 7 days" or the special exceptions for late customers—were generally applied in the industry. Furthermore, Stiehl conceded, inconsistently with his other testimony, that Tolona was one of an "exceptional group of customers of Rose ... fall[ing] outside the common industry practice and standards." In light of these anomalies in the evidence, the bankruptcy judge concluded that Rose had failed to establish that Tolona's payments fit the industry practice.

Under Bankruptcy Rule 8013, the district court on appeal must defer to the bankruptcy court's findings of fact unless they are clearly erroneous. *See, e.g., In re Bonnett*, 895 F.2d 1155, 1157–58 (7th Cir.1989) (reversing a district court's reversal of a bankruptcy court's decision because the former incorrectly applied a de novo standard of review to the latter's factual determinations); *In re Kimzey*, 761 F.2d 421, 423 (7th Cir.1985) ("[T]he district court must accept the bankruptcy court's findings of fact unless they are clearly erroneous. The court of appeals also must restrict its review of factual findings to this narrow standard.") (citations omitted). The district judge in this case made no such determination, but instead held, without elaboration, that the bankruptcy court had "misinterpreted" Stiehl's testimony. The district court chose not to address the difficulties that the bankruptcy court identified in Stiehl's testimony, nor did it mention any other testimony that would have supported Rose's contention. Rather, it simply announced that Stiehl's statements supported a conclusion that Rose's credit practices used with Tolona were no different from those applied generally in the industry.

I do not believe that such a summary reversal of a bankruptcy court's findings of fact should stand. The district judge devoted most of his opinion to a defense of the view, which the court's decision now rejects, that section 547(c)(2)(C) does not mandate an examination of "objective" industry standards if the debtor and the creditor had their own established course of dealing. Only in the final two paragraphs of its opinion did the district court touch upon the alternate theory that Stiehl's testimony indicated that Tolona's payment schedule actually did conform to industry-wide norms. Given the peremptory rejection of the bankruptcy court's findings without a determination of clear error, I would reverse the district court's decision and reinstate the decision of the bankruptcy court.

---

1. Contrary to the position of the majority, I believe that Tolona did raise this issue on appeal. Part II of Tolona's brief recited the bankruptcy court's conclusion that Rose had failed to carry its burden of proof, and further explained why that conclusion was justified on the record. While admittedly Tolona did not invoke the words "clear error," it indicated its belief that the bankruptcy court's factual determinations should have been upheld, and, equivalently, that the district court paid them insufficient deference.