**1012**

In re VALLEY STEEL PRODUCTS
COMPANY, INC., et al.,
Debtors.

The OFFICIAL PLAN COMMITTEE ON
BEHALF OF the ESTATE OF VAL-
LEY STEEL PRODUCTS COMPANY,
INC., et al., Plaintiffs,

v.

CHAMPION DISTRIBUTION
SERVICES, Defendant.

Bankruptcy No. 92–40778–293.
Adv. No. 93–4122–293.

United States Bankruptcy Court,
E.D. Missouri, E.D.

Nov. 11, 1993.

Mark H. Zoole, Weier, Hockensmith &
Sherby, P.C., St. Louis, MO, for defendant.

Robert E. Eggmann, Greensfelder, Hemk-
er & Gale, P.C., St. Louis, MO, for Official
Plan Committee.

### MEMORANDUM OPINION

DAVID P. McDONALD, Bankruptcy
Judge.

### JURISDICTION

This Court has jurisdiction over the parties
and subject matter of this proceeding pursu-
ant to 28 U.S.C. §§ 1334, 151, and 157 and
Local Rule 29 of the United States District
Court for the Eastern District of Missouri.
This is a "core proceeding" pursuant to 28
U.S.C. § 157(b)(2)(F), which the Court may
hear and determine.

### PROCEDURAL BACKGROUND

(1) On or about February 4, 1992, the
affiliated entities of Valley Steel Products
Company, Inc., Valley Industries, Inc., Valley
Steel Products Company Transportation,
Inc., Valley Steel Products Company Rede-
velopment Corp. and Performance Pipe and
Steel, Inc. (the affiliated Valley Steel compa-
nies) filed voluntary petitions for relief under
Chapter 11 of the Bankruptcy Code.

(2) On February 5, 1992, the Office of the
United States Trustee appointed the Official
Unsecured Creditors' Committee in the Val-
ley Steel Products Company, Inc. case.

(3) This Court entered an order, on March
11, 1993, consolidating the bankruptcy pro-
ceedings of the affiliated Valley Steel compa-
nies.

(4) The Court confirmed a plan of reorga-
nization on March 8, 1993, which provided
that the Official Plan Committee (Commit-
tee) had standing to prosecute Chapter 5
causes of action on behalf of the consolidated
estate of the affiliated Valley Steel compa-
nies.

(5) The Committee filed an adversary
Complaint on April 15, 1993 seeking to avoid
and recover from, Champion Distribution

Services (Champion)[1] alleged preferential transfers (the Transfers) totalling $9,311.77.[2] The Debtor effected the Transfers via five checks. In making the transfers, the Debtor sought to satisfy payment on twelve invoices for services the Defendant had performed for the Debtor.

(6) Champion filed an Answer to the Committee's Complaint asserting, as an affirmative defense, that the allegedly preferential transfers were payments in the ordinary course of business. The Defendant also defended the transfers as contemporary exchanges for new value.

(7) The Court held a hearing on this matter on November 8, 1993.

*FACTUAL BACKGROUND*

After considering the record in this adversary, including but not limited to the parties' Joint Stipulation of Facts and the testimony adduced at the November 8, 1993 hearing, the Court makes the following findings of fact:

(1) Champion, a common carrier, was an unsecured creditor of Valley Steel Products Company.

(2) From November 4, 1991 to February 4, 1992, Valley Steel Products Company, Inc. (Valley) transferred to Champion five checks written for an amount totalling $9,311.77 to pay Champion for services it had previously rendered for the Debtor. The Transfers, made at a time when Valley was insolvent, resulted in a transfer of the Valley's property.

(3) The Transfers were made on account of antecedent debts and occurred during the ninety days immediately preceding the Debtor's filing of its bankruptcy petition.

(4) The Transfers allowed Champion to receive more than it would have had the transfers not been made and had Champion received a distribution pursuant to Chapter 7 of the Bankruptcy Code.

(5) The Committee has chosen not to challenge as a preferential transfer, the transfer of $908.00 via check no. 100822 and now seeks to avoid payments on only eleven invoices totalling $8,403.77.

(6) Debtor and the Defendant transacted business with one another for nearly two years before the Debtor filed its petition for relief under the Bankruptcy Code. During that time Champion issued invoices to Valley, which Valley would pay. These invoices did not contain any payment terms and Valley often paid more than one invoice with a single check. Tables summarizing the Debtor's history of payments to Champion reflect the experience of 229 payments and show delays in payment ranging from 16 days to 145 days after the date of an invoice's issuance. Through the course of the 229–payment history, the Debtor, on average, paid Champion the amounts owed to it 45.76 days after the invoice date.

(7) The remaining challenged transfers represent Valley's payments on eleven invoices written from 25 to 76 days before the payment date. The challenged transfers paid invoices with an average age of 45.64 days.

(8) David G. Dimit, Champion's president, testified at the hearing the Court held on this matter on November 8, 1993. He stated that, despite Interstate Commerce Commission regulations requiring payment within 15 days of invoice, late payment is common in the trucking industry and that the payment history between Valley and Champion fit the industry's norm.

(9) Patrick Gilligan Jr., Valley's Chief Financial Officer also testified before the Court on November 8, 1993. Mr. Gilligan indicated

---

1. Plaintiff's original Complaint names as defendants Ozark Transportation Inc., Eagle Investment Inc. and Curtis Transportation Inc. all d.b.a. Champion Distribution Services. The defendants, in fact, are partners in Champion Distribution Services and do not simply do business under that name. The Plaintiff later amended its Complaint to name Champion Distribution Services, Inc., a partnership, as the defendant to in this adversary.

2. The Committee initially challenged all the transfers that occurred during the preference period but later stipulated that one payment, in the amount of $908.00 was "no longer in issue." As amended to reflect the parties' stipulation, the Committee's complaint seeks to avoid preferences of $8,403.77.

that, beginning in 1987, the Valley affiliated companies experienced cash flow problems. He stated that before 1987 the Valley affiliated companies had paid their bills in an ordinary manner but that after 1987 those companies paid their bills in a seasonal manner, generally falling behind during the Fall months and paying on a more regular basis in other months. Mr. Gilligan emphasized that as the Debtor's financial position deteriorated many entities refused to conduct business with the Debtor and the Valley affiliated companies began to pay their bills selectively.

## DISCUSSION

The Eighth Circuit's decision in *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494 (8th Cir.1991) controls this case. In *Lovett* the Eighth Circuit confronted the issue of whether late payments on invoices can be payments in the ordinary course of business and so qualify, under section 547(c)(2) of the Bankruptcy Code, as exceptions to the trustee's avoidance powers.[3]

The *Lovett* debtor, International Transportation Systems (International), was a "freight forwarder, consolidator and distributor" in the trucking business. 931 F.2d at 495. International and St. Johnsbury, a common carrier of freight, serviced different geographic areas. *Id.* A year and one-half before International filed for bankruptcy protection, the two trucking concerns entered into a reciprocal agreement under which each would collect freight in its region for delivery in the other's region and then forward that freight to the second concern who would deliver it to the destination within the region it regularly serviced. *Id.*

International's agreement with St. Johnsbury obligated the freight-forwarding party to pay the freight-receiving party a percentage of the amount the freight-forwarding company collected from the shipping customer "on or before the 30th day after the shipment." *Id.* St. Johnsbury and the debtor operated under the agreement until International filed its bankruptcy petition. *Id.* Despite the language in the reciprocal agreement requiring payment within thirty days, International consistently paid St. Johnsbury for its services much more than thirty days after the date of the shipment. 931 F.2d at 496. In fact, during the year preceding the ninety-day preference period, International, on average, paid St. Johnsbury for its services sixty-two (62) days after the shipment date. *Id.*

During the ninety-day preference period, International paid St. Johnsbury for services St. Johnsbury had performed pursuant to the reciprocal agreement. 931 F.2d at 496. On average, the invoices paid during the preference period were fifty-two (52) days old. 931 F.2d at 498. The trustee of International's estate challenged, as preferences, those payments International made to St. Johnsbury during the preference period for services rendered more than thirty days before the payment date.[4] *Id.* at 496. St. Johnsbury countered the trustee's preference action with the defense that International had made the payments in the ordinary course of its business which brought those payments within the scope of Bankruptcy Code section 547(c)(2)'s exception to the trustee's avoiding powers.

The Bankruptcy Court held that the payments made during the preference period to St. Johnsbury for service rendered more than thirty days before payment were preferential transfers and that they did not qualify for the Code's ordinary course of business exception to the trustee's avoiding powers. The District Court affirmed the Bankruptcy Court's decision. The Eighth Circuit affirmed the lower courts' determination that International's payments to St. Johnsbury during the preference period for services rendered more than thirty days before payment were preferences. 931 F.2d at 497. However, the Circuit Court reversed the bankruptcy court's finding that the challenged late payments did not qualify as pay-

---

3. As is noted above, the plan of reorganization vested the Committee with the power to pursue Chapter 5 claims on the estate's behalf.

4. The trustee also sued St. Johnsbury to collect those of the debtor's accounts receivable representing charges for services International had performed for St. Johnsbury under the reciprocal agreement. 931 F.2d at 496.

ments made in the ordinary course of business. *Id.*

The Eighth Circuit reasoned that late payments can be payments in the ordinary course of business when the creditor trying to establish the exception to the trustee's avoiding powers shows that the late payments were consistent with how the parties had previously conducted their business. *Id.* at 497. The Circuit noted that the determination of whether a late payment is within the ordinary course of business of two parties is "peculiarly factual." 931 F.2d at 497 (quoting *In re Fulghum Construction Corp.,* 872 F.2d 739, 743 (6th Cir.1989)). The Court emphasized that to prevail on the theory that a late payment was in the ordinary course of business and so beyond the scope of the trustee's avoiding powers, a "creditor must demonstrate some consistency with other business transactions between the debtor and the creditor." 931 F.2d at 497 (citation omitted).

Applying the law to the evidence St. Johnsbury presented, the Eighth Circuit concluded that St. Johnsbury had proven that the payments International made to it during the preference period, though late under the terms of the reciprocal agreement, were payments in the ordinary course of business between the parties. St. Johnsbury had entered into evidence records of payments International had made to St. Johnsbury over the year preceding the preference period and records showing the debtor's payments to St. Johnsbury during the preference period. *Id.* at 498. The Circuit Court condensed that data into the following table which it included in its opinion:

| Age of Invoice | Percent (Number) of Total Invoices Paid | |
| --- | --- | --- |
| | 12–month period | 90–day period |
| 30 Days or less | 6.3% ( 45) | 0.0% ( 0) |
| 31–45 Days | 14.9% (107) | 54.9% (67) |
| 46–60 Days | 30.1% (217) | 18.9% (23) |
| 61–75 Days | 27.6% (199) | 9.8% (12) |
| 76 Days or More | 21.1% (152) | 16.4% (20) |

931 F.2d at 498.

The Circuit Court compared the two payment schedules and recognized that late payment on invoices issued under the reciprocal agreement was the standard practice between the parties. *Id.* The Court found that in both the year before the preference period and in the preference period, St. Johnsbury's evidence showed that International paid the "bulk of the invoices" evidencing sums owed to St. Johnsbury only after "substantial and significant delays." *Id.* The Eighth Circuit held this fact to "be dispositive" of whether the late payments were in the ordinary course of business, despite proof that during the preference period International paid St. Johnsbury for its services, on average, about ten days sooner than it had done in the year preceding the preference period. *Id.*

Language in the Eighth Circuit's *Lovett* opinion suggests that the application of "economic pressure to obtain payment as soon as possible" could take a payment out of the ordinary course of business exception. 931 F.2d at 499 (citation omitted). The Circuit explained that St. Johnsbury's requests that International "accelerate its payments 'as much as possible'" did not amount to the economic pressure which would remove a payment from the ordinary course of business. *Id.*

Finally, the *Lovett* court examined whether a creditor seeking to prove that a payment qualifies as a payment in the ordinary course of business has to show a correlation between the debtor's payment history and the general payment practice in the industry. 931 F.2d at 499. The Circuit Court did not decide whether the Code required St. Johnsbury to make such a showing but it held that "[t]o the extent, if any, that section (c)(2)(C) requires [such a] comparison ... St. Johnsbury, [by] introduc[ing the uncontroverted] testimony of two of its officials that it is 'common' in the trucking industry—even when 30–day payment terms are required by contract—for payments [to be made after expiration of the thirty-day period]" had sat-

isfied "whatever burden" it might have had on the issue. *Id.*

A more recent Eighth Circuit decision discussed this portion of the *Lovett* opinion and emphasized that the Circuit had "explicitly left open the question of what proof was required under section (c)(2)(C)." *Claude R. Jones v. United Savings and Loan Assoc. (In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.),* 9 F.3d 680, 684 (8th Cir.1993). However, the *U.S.A. Inns* court pointed out that the *Lovett* opinion "inferentially endorsed the view that subsection (c)(2)(C) requires an objective standard." *Id.* The *U.S.A. Inns* court ultimately adopted the position that subsection (c)(2)(C) requires proof of compliance with an objective industry standard. *Id.* at 684. However, in discussing the evidence necessary to establish that an alleged preference conforms to an objective industry standard, the Eighth Circuit agreed with the Seventh Circuit's view that the term "ordinary course of business" in subsection (c)(2)(C) "refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside the broad range should be deemed extraordinary and therefore outside the scope of subsection (C)." *Id.* at 685 (citing *In re Tolona Pizza Prod. Corp.,* 3 F.3d 1029, 1033 (7th Cir.1993)). The Eighth Circuit, in applying this standard, held that the uncontroverted testimony of the defendant's president, chairman of the board and chief executive officer stating that it was common for savings institutions to try to work with delinquent customers so long as the lender received some payment sufficed to carry the burden subsection (C) placed upon the defendant. *In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.,* 9 F.3d 680, 685 (8th Cir. 1993).

In the case at bar, the parties submitted data to the Court chronicling their business relationship. The following table summarizes that data:

| Age of Invoice | Percent (Number) of Total Invoices Paid | |
|---|---|---|
| | Prior 229 payments | 90–day period |
| 30 Days or less | 11.8% ( 29) | 16.7% (2) |
| 31–45 Days | 48.5% (109) | 33.3% (4) |
| 46–60 Days | 25.3% ( 58) | 25.0% (3) |
| 61–75 Days | 4.3% ( 10) | 16.7% (2) |
| 76 Days or More | 10.0% ( 23) | 8.0% (1)* |

*This payment occurred during the preference period but is no longer challenged as a preference.

During the preference period the Debtor paid Champion's invoices, on average, 45.64 days after their issuance. Through the course of its pre-preference period, 229–payment history with Champion Valley paid the invoices Champion issued, on average, 45.76 day after issuance. These average payment times differ by less than three hours. The table compiled from the record of payments between Valley and Champion shows more similarity between the distribution through time of the historical record of payments and the distribution through time of those made during the preference period than the similar table in the *Lovett* case demonstrated. For example, the data in *Lovett* showed that before the preference period, the debtor paid 14.9% of St. Johnsbury's invoices in the 31 to 45 day time frame but that during the prefer-

ence period the percent of invoices paid in that time frame increased to 54.9. A comparison of the percentages in the other time frames on the *Lovett* table, reprinted above, yields similar, though less dramatic, differences. Despite these differences, the Eighth Circuit stated that "[a]lthough it appears that payment generally was made somewhat sooner in the 90–day period than during the preceding 12 months, the difference was not sufficiently significant to show that the payments during the 90–day period did not follow the ordinary course of business reflected in the prior 12–month period." 931 F.2d at 498.

The data now before the Court shows that in the period before the preference period, Valley paid 48.5% of the invoices Champion

issued in the 31 to 45 day from issuance time frame and that during the preference period, it paid 33% of its invoices in this time frame. Similarly, the Debtor, in the 21 months preceding the preference period, paid 25.3% of the invoices Champion issued to it in the 46 to 60 day from issuance time frame. During the preference period, Valley paid 25% of the invoices defendant issued to it in between 45 and 60 days. Simply stated, the data now before the Court shows more similarity between the parties' course of dealing in the preference period and their dealings preceding that period than the data in *Lovett* did. Further, the average time of payment in *Lovett* varied by ten days and the information available to the Court in this case indicates a difference of only about three hours. Given these numerical observations and the precedent established in *Lovett*, the Court holds that the payment of the eleven invoices, though preferential, is not avoidable because such payment was made in the ordinary course of business.

An Order consistent with this Memorandum Opinion will be entered this date.

### *ORDER*

For the reasons set forth in the Memorandum Opinion filed this date, it is ORDERED THAT:

1. the transfers of value from Valley Steel Products Company to Champion Distribution Services between November 4, 1991 and February 4, 1992 were made in the ordinary course of business and are exempt from the trustee's avoidance powers pursuant to 11 U.S.C. § 547(c)(2) and

2. Plaintiff's request to avoid and recover those transfers of value from Valley Steel Products Company to Champion Distribution Services that occurred between November 4, 1991 and February 4, 1992 IS DENIED.