In re **FURRS SUPERMARKETS, INC.,** Debtor.

**Yvette Gonzales, Plaintiff,**

v.

**DPI Food Products Company, Defendant.**

**Bankruptcy No. 7–02–10779 SA. Adversary No. 02–1128 S.**

United States Bankruptcy Court, D. New Mexico.

Aug. 4, 2003.

---

Robert A Johnson, Albuquerque, NM, for Defendant.

Chris W Pierce, Albuquerque, NM, for Plaintiff.

### MEMORANDUM OPINION IN SUPPORT OF ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON § 547 ISSUES

JAMES S. STARZYNSKI, Bankruptcy Judge.

This matter is before the Court on Plaintiff's Motion for Summary Judgment

("Motion") (doc 22) and Defendant's Response ("Response") (doc 27). Defendant filed a Motion for Summary Judgment based on Bankruptcy Code section 550 and standing that was addressed in another opinion. This is a core proceeding. 28 U.S.C. § 158(b)(2)(F). Plaintiff appears through her attorney Davis & Pierce, P.C. (Chris W. Pierce). DPI Food Products Company ("DPI" or "Defendant") appears through its attorney Johnson & Nelson, P.C. (Robert A. Johnson). For the reasons set forth below, the Court grants Plaintiff's Motion in part.

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Bankruptcy Rule 7056(c). In determining the facts for summary judgment purposes, the Court may rely on affidavits made with personal knowledge that set forth specific facts otherwise admissible in evidence and sworn or certified copies of papers attached to the affidavits. Fed.R.Civ.P. 56(e). When a motion for summary judgment is made and supported by affidavits or other evidence, an adverse party may not rest upon mere allegations or denials. *Id.* The court does not try the case on competing affidavits or depositions; the court's function is only to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Plaintiff's motion seeks summary judgment on her complaint to avoid and recover preferential transfers. Defendant admitted jurisdiction and the timing and amounts of payments and delivery of goods, but denied all other allegations of the complaint. Defendant asserted seven affirmative defenses: 1) that during the preference period DPI shipped goods in excess of $70,000 more in value to Furr's than Furr's paid DPI, and that therefore DPI did not improve its position during the preference period;[1] 2) Section 547(c)(2) (ordinary course of business); 3) the payment of January 14, 2001 of $60,000 was less than the value of merchandise delivered by DPI to Furr's during the 30 days immediately prior to payment;[2] and 4) DPI delivered more to Furr's after January 21, 2001 than it was paid on that date (i.e., section 547(c)(4) subsequent new value). Defenses 5), 6) and 7) deal with the Trustee's standing to bring this action and are not discussed in this Memorandum Opinion.

### STATUTORY PROVISIONS AND ANALYSIS

Section 547(b) provides:

Except as provided in subsection (c) of this section, the trustee may avoid any

---

1. The "net result rule" is not a defense listed in section 547(c). The defense was a judicially created doctrine under the Bankruptcy Act of 1898 but it was not continued in the Bankruptcy Code. *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 706 F.2d 171, 173 (6th Cir.1983). The net result rule has been replaced by the subsequent advance or "new value" rule of section 547(c)(4). *Id.* at 174. To the extent that DPI did not improve its position, that would be relevant only if it were a secured creditor with a lien on inventory, receivables and proceeds. *See* Section 547(c)(5). Courts may not create new exceptions to section 547(b). *Enserv Co. v. Man-* *power, Inc./California Peninsula (In re Enserv Co.)*, 64 B.R. 519, 520 (9th Cir. BAP 1986) *aff'd* 813 F.2d 1230 (1987). Therefore, DPI's first affirmative defense will be stricken.

2. The delivery of merchandise prior to a payment is not a section 547(c) defense. Delivery of new value is only relevant if 1) there is a substantially contemporaneous exchange, section 547(c)(1), or 2) the new value is provided after the payment, section 547(c)(4). Therefore, DPI's third affirmative defense will be stricken.

transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition;

. . .

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

[T]he preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally. The operation of the preference section to deter "the race of diligence" of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section—that of equality of distribution.

*Union Bank v. Wolas,* 502 U.S. 151, 161, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991). *See also Johnson v. Barnhill (In re Antweil),* 931 F.2d 689, 692 (10th Cir.1991), *aff'd* 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992)("The most important purpose of section 547(b) is to facilitate equal distribution of the debtor's assets among the creditors.").

Section 547(c) provides in relevant part:

The trustee may not avoid under this section a transfer—

(1) to the extent such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

. . .

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest, and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

Section 547(f) provides:

For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.

Section 547(g) provides:

For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section, and the creditor or party in interest against whom recov-

ery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section.

## CONTEMPORANEOUS EXCHANGE FOR VALUE DEFENSE: SECTION 547(c)(1)

 Section 547(c)(1) protects transfers from attack if (1) the preference defendant extended new value to the debtor, (2) both the defendant and the debtor intended the new value and reciprocal transfer by the debtor to be contemporaneous and (3) the exchange was in fact contemporaneous.

The purpose of the contemporaneous exchange exception ... is to encourage creditors to continue to deal with troubled debtors without fear that they will have to disgorge payments received for value given. If creditors continue to deal with a troubled debtor, it is possible that bankruptcy will be avoided altogether.

5 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 547.04[1], at 547–47–48 (15th ed. rev.2003)(Footnotes omitted.) The parties' intent to make a contemporaneous transfer is an essential element of a section 547(c)(1) defense. *Lowrey v. U.P.G. Inc. (In re Robinson Bros. Drilling, Inc.)*, 877 F.2d 32, 33 n. 1 (10th Cir.1989). *See also Harrah's Tunica Corp. v. Meeks (In re Armstrong)*, 291 F.3d 517, 525 (8th Cir.2002) (the parties' intent is the critical inquiry)(*quoting Official Plan Comm. v. Expeditors Int'l of Washington, Inc. (In re Gateway Pacific Corp.)*, 153 F.3d 915, 918 (8th Cir.1998)). The section protects transfers that do not result in diminution of the estate because unsecured creditors are not harmed by the transfer if the estate was replenished by an infusion of assets that are of roughly equal value to those transferred. *Manchester v. First Bank & Trust Co.*

*(In re Moses)*, 256 B.R. 641, 652 (10th Cir. BAP 2000).

## ORDINARY COURSE OF BUSINESS DEFENSE: SECTION 547(c)(2)

 The purpose of [the ordinary course of business defense] is to leave undisturbed normal financial relations, because doing so does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy. *See* 11 U.S.C.A. § 547. "This section is intended to protect recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the debtor and the debtor's transferee." 4 *Collier on Bankruptcy*, ¶ 547.10 (15th ed.1991).

*Sender v. Nancy Elizabeth R. Heggland Family Trust*, 48 F.3d 470, 475 (10th Cir. 1995).

On the one hand the preference rule aims to ensure that creditors are treated equitably, both by deterring the failing debtor from treating preferentially its most obstreperous or demanding creditors in an effort to stave off a hard ride into bankruptcy, and by discouraging the creditors from racing to dismember the debtor. On the other hand, the ordinary course exception to the preference rule is formulated to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy.

*Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.)*, 18 F.3d 217, 219 (3rd Cir. 1994). To be protected, a transfer must be ordinary both from the transferee's perspective and the debtor's perspective. *In re Milwaukee Cheese Wisconsin, Inc.*, 112 F.3d 845, 848 (7th Cir.1997)(*citing Marathon Oil Co. v. Flatau (In re Craig Oil*

*Co.)*, 785 F.2d 1563 (11th Cir.1986)); *In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1032 (7th Cir.1993)("One condition is that payment be in the ordinary course of both the debtor's and the creditor's business.") *See also* H.R.Rep. No. 595, 95th Cong., 1st Sess 373 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5874, 6329 (legislative history suggests that purpose of this section is to avoid unusual actions by *either* the debtor *or* its creditors).

■ Section 547(c)(2) encourages normal credit transactions and the continuation of short-term credit dealings with troubled debtors to stall rather than hasten bankruptcy. *Logan v. Basic Distribution Corp. (In re Fred Hawes Organization, Inc.)*, 957 F.2d 239, 243 (6th Cir. 1992); *Harrah's Tunica Corp. v. Meeks (In re Armstrong)*, 291 F.3d 517, 527 (8th Cir.2002).

■ For the purposes of 547(c)(2), a transfer occurs upon delivery of a check. *Bernstein v. RJL Leasing (In re White River Corp.)*, 799 F.2d 631, 633 (10th Cir. 1986). *Compare Barnhill v. Johnson*, 503 U.S. 393, 394–95, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992)(For 547(b) purposes a transfer made by check occurs on the date the drawee bank honors it.)

■ A creditor has the burden of proving that payments qualify for the ordinary course of business exception of § 547(c)(2). 11 U.S.C. § 547(g); *Clark v. Balcor Real Estate Finance, Inc. (In re Meridith Hoffman Partners)*, 12 F.3d 1549, 1553 (10th Cir.1993) *cert. denied*, 512 U.S. 1206, 114 S.Ct. 2677, 129 L.Ed.2d 812 (1994). Failure to meet any of the three requirements of § 547(c)(2) results in denial of the defense. *Id.* The § 547(c)(2) de-

fense is narrowly construed. *Payne v. Clarendon Nat'l Ins. Co. (In re Sunset Sales, Inc.)*, 220 B.R. 1005, 1020 (10th Cir. BAP 1998); *Jobin v. McKay (In re M & L Business Machine Company, Inc.)*, 84 F.3d 1330, 1339 (10th Cir.1996). "Preferences are disfavored, and subsection C makes [terms wholly unknown to the industry] more difficult to prove." *Tolona Pizza*, 3 F.3d at 1032.

■ There is generally no disagreement over the first requirement (*i.e.*, § 547(c)(2)(A)) that a debt was incurred in the ordinary course of business of the debtor and the transferee; reported cases under § 547(c)(2) overwhelmingly focus on subsections (B) and (C). Under those sections the creditor must prove that the transfers were ordinary as between the parties (§ 547(c)(2)(B)), which is a "subjective test", and ordinary in the industry (§ 547(c)(2)(C)), which is an "objective test". *Id.*

### Section 547(c)(2)(B)

■ Courts consider four primary factors to determine if payments are ordinary between the parties as required under the subjective test set forth in subsection (B): (1) the length of time the parties were engaged in the transaction in issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activity; and (4) the circumstances under which the payment was made.[3] These factors are typically considered by comparing pre-preference period transfers with preference period transfers. *Sunset Sales, Inc.* 220 B.R. at 1020–21.

The relations of the debtor and the creditor are placed in a vacuum, and the

---

**3.** The Tenth Circuit Court's fourth factor differs from some other courts' test, which is "whether the creditor took advantage of debtor's deteriorating financial condition." *See,* e.g., *Sulmeyer v. Pacific Suzuki (In re Grand Chevrolet, Inc.)*, 25 F.3d 728, 731 (9th Cir. 1994).

transfer in question is assessed for its consistency with those relations. What is subjectively ordinary between the parties is answered from comparing and contrasting the timing, amount, manner and circumstances of the transaction against the backdrop of the parties' traditional dealings. The transaction is scrutinized for anything unusual or different.

*Morris v. Kansas Drywall Supply Co. (In re Classic Drywall, Inc.)*, 121 B.R. 69, 75 (D.Kan.1990) (Citations omitted). In other words, the Court compares the preference period to a prior period. The comparison should be with a period "preferably well before" the preference period, presumably before the Debtor started experiencing financial problems. *Tolona Pizza Products*, 3 F.3d at 1032. "Generally, the entire course of dealing is considered." *Brown v. Shell Canada Ltd. (In re Tennessee Chemical Co.)*, 112 F.3d 234, 237 (6th Cir.1997). *See also Iannacone v. Klement Sausage Co. (In re Hancock–Nelson Mercantile Co.)*, 122 B.R. 1006, 1013 (Bankr.D.Minn.1991)(Baseline period should extend back into the time before debtor became distressed.) *Cf. Meridith Hoffman Partners*, 12 F.3d at 1553 (Ordinary business terms under section 547(b)(2)(C) are those "when debtors are healthy.")

*Section 547(c)(2)(C)*

■ Under § 547(c)(2)(C) "[t]he court here compares and contrasts the particular transaction against the 'practices' or 'standards' of the industry. A transaction is objectively ordinary if it does not deviate from industry norm but does conform to industry custom." *Classic Drywall, Inc.*, 121 B.R. at 75.

Ordinary business terms, as used in paragraph (C), is thought of as an objective test. Courts consider whether the payment is ordinary in relation to the standards prevailing in the relevant industry. The circuit courts are currently divided about how to determine whether a particular transaction falls within the confines of ordinary business terms. Three prevalent views have emerged. One view, espoused by the Second, Sixth, Seventh and Eighth Circuits, emphasizes the range of terms used by firms that are similar to the creditor. The Tenth Circuit follows a narrower definition of ordinary business terms, excluding extraordinary circumstances from consideration, such as collection practices that may be used when the debtor is financially unhealthy. The Third and Fourth Circuits take a middle ground, defining ordinary business terms on a "sliding-scale" approach that is based on the length of the relationship between the debtor and the creditor.

Ann van Bever, *Current Preference Issues*, 1 J. Small & Emerging Bus. L. 297, 306 (1997)(footnotes omitted).

■ In *Meridith Hoffman Partners* the Tenth Circuit discussed the term "ordinary business terms" used in § 547(c)(2)(C). 12 F.3d at 1553. The Court stated that "ordinary business terms" could mean either 1) terms that creditors in similar situations would commonly use, even if the situation itself is extraordinary, or 2) terms that are used in usual or ordinary situations. *Id.* It adopted the latter meaning, and further elaborated that "[o]rdinary business terms therefore are those used in 'normal financing relations'; the kinds of terms that creditors and debtors use in ordinary circumstances, *when debtors are healthy*." [4]

---

**4.** This definition by the Tenth Circuit has been called "unique" because it flatly rejects both

the "party-focused view" (court excludes late payments from preference attack when the

**42**

*Id.* (Emphasis added.) This interpretation raises difficulties for defendants because it makes irrelevant evidence of similar businesses' treatment of delinquent customers who are having financial problems.

In *Meridith Hoffman Partners*, the Tenth Circuit ruled that the escrow payment arrangement at issue was not a normal financing arrangement, but rather one only used in the industry when the payor (debtor) is in trouble. 12 F.3d at 1554. The court did *not* qualify the "ordinary business terms" test by requiring reference to the length of the relationship between the debtor and the creditor. *Id.* at 1553–54. *Compare, e.g., In re Molded Acoustical Products, Inc.,* 18 F.3d at 226 ("In addition [to what is 'not unusual' in the industry], when the parties have had an enduring, steady relationship, one whose terms have not significantly changed during the pre-petition insolvency period, the creditor will be able to depart substantially from the range of terms established under the objective industry standard inquiry and still find a haven in subsection C."). But the length of the relationship between the creditor and debtor would seem on its face to have little to do logically with what the industry practice is.[5] Most courts of appeal have recognized that the differing language and placement in the statute of subsections B and C require that each subsection have its own meaning as a part of the tripartite "ordinary course" test, *e.g., id.* at 219 n. 1, and as *Meridith Hoffman Partners* dem-

onstrates, nothing in the "ordinary business terms" portion of the test requires a partial conflation of subsections B and C.

DPI argues that the Tenth Circuit is alone among all the circuits in interpreting "ordinary business terms" to exclude arrangements between creditors and distressed debtors, and suggests that it is merely a matter of time before the Tenth Circuit falls in line with the other circuits. DPI thus urges this Court to anticipate or help precipitate that change. As beguilingly argued as DPI's invitation is, the Court declines it, for several reasons.

The Tenth Circuit does seem to be somewhat unique among the circuits in explicitly requiring an industry standard using a healthy debtor. DPI says that *Tolona Pizza* or some close variant thereof, which allows a court to treat as "ordinary" the conduct of debtors who are in trouble with their creditors, has become the nationally accepted interpretation of "ordinary business terms". Thus, DPI urges, the Court should look to "the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage ...," 3 F.3d at 1033 (emphasis omitted), by which DPI means that this Court should take evidence on grocery retailers in distress.

*Meridith Hoffman Partners* is binding on the Court. And the language of that decision is clear that the "healthy debtor" standard was not an inadvertent statement; the court in *Meridith Hoffman*

---

manner and timing conform to the manner and timing of previous payments made and accepted between the parties) and the "industry-terms view" (court asks whether the manner and timing of the late payments conforms to the general and accepted methods of the parties' industry) adopted by the other circuits. Janet E. Bryne Thabit, *Ordinary Business Terms: Setting the Standard for 11 U.S.C. § 547(c)(2)(C),* 26 Loy. U. Chi. L.J. 473, 489–90, 496 (1995). In fact, the Tenth Circuit test

set out in *Meridith Hoffman Partners* does accept the "industry-terms" view, although it refines that test by requiring that the behavior of healthy debtors be the measure of behavior. *Id.* at 1553.

5. The Court does not find persuasive the economic or behavioral speculation that underlie decisions such as *In re Molded Acoustical Products, Inc.,* 18 F.3d at 224–25.

*Partners* specifically considered the option of interpreting "ordinary business terms" to include how parties ordinarily deal with each other in unusual circumstances and chose instead the healthy debtor standard. 12 F.3d at 1553.

The Tenth Circuit's position is completely consistent with facilitating the prime bankruptcy policy of equality of distribution among creditors of the debtor. *Union Bank v. Wolas,* 502 U.S. at 161, 112 S.Ct. 527. The cases which treat as ordinary course of business what debtors do when they are in financial straits miss the forest for the trees by overlooking the fact that "the preference provisions facilitate the *prime* bankruptcy policy of equality of distribution among creditors of the debtor." H.Rep. No. 595, 95th Cong., 1st Sess. 177–78 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin. News 5963, 6138. (Emphasis added.) The Code's exceptions for actions such as contemporaneous exchanges of new value, ordinary course transactions, and subsequent new value deliveries fulfil the Congressional purposes of sheltering ordinary business transactions, encouraging creditors to continue to deal with debtors threatened with bankruptcy and potentially slowing or even preventing a bankruptcy. Since Congress has addressed the policy issues in the statute, courts need not tilt the standards therein one way or the other to provide further incentives for specific behavior or protection for specific parties. For example, a creditor having received what it fears might be a preferential payment is encouraged under § 547(c)(4) to provide subsequent new value to the debtor, knowing that if the debtor files within the next ninety days, the creditor will be credited for that new value, and also knowing that perhaps the new value will keep the debtor going long enough to put the preferential payment, and perhaps subsequent payments, beyond reach of a later filed petition. In other words, having accepted the payment, the creditor is no worse off, and potentially better off, by continuing to deal with the debtor. And those choices and opportunities are presented to the creditor by the terms of the statute as Congress has written it. Thus the enhancement of the creditor's position that is represented by cases such as *Tolona Pizza* and *Molded Acoustical Products* is not necessary to fulfil the Congressional purposes behind § 547(c).

Additionally, the Tenth Circuit's "healthy debtor" standard appears to "permit a brighter-line test for determining ordinary business terms; permitting distressed debtor arrangements to be treated as ordinary makes it hard to distinguish where 'ordinary' leaves off and desperation begins." *Arrow Electronics, Inc. v. Justus (In re Kaypro),* 218 F.3d 1070, 1074 (9th Cir.2000) is an example of the latter situation, holding that a distressed and defaulting debtor's entry into a debt-restructuring agreement, and requiring for the first time the guaranty of the debtor's principal, might constitute "ordinary business terms." [6]

In explaining "ordinary business terms" the court in *Tolona Pizza* was concerned about the difficulty faced by a creditor of defining the relevant market and gathering the requisite evidence. 3 F.3d at 1033 ("Not only is it difficult to identify the industry whose norm shall govern . . . , but there can be great variance in billing practices within an industry."). Apparently

---

**6.** Not that ease of drawing the line should determine the interpretation of the statute; the point only is that the "healthy debtor" standard has at least one distinct advantage over the standard used by the many of the other circuits and therefore should not be lightly abandoned.

that concern led the court to partially conflate the standards of subsections B and C. 3 F.3d at 1033: "These dealings are conceded to have been within the normal course of dealings between the two firms, . . . ." The court made this statement in the course of discussing subsection C, not subsection B, and after the first part of the decision clearly stated that subsection B was the subsection that requires an examination of the dealings between the debtor and the creditor and that subsection C required examination of the industry practice, a different issue. 3 F.3d at 1031–33. Notwithstanding the concerns of the Seventh Circuit, however, changing the statute is not the solution to perceived difficulties of proof.

All this is not to say that the term "ordinary business terms" is devoid of ambiguity; indeed, *Meridith Hoffman Partners* recognizes that ambiguity explicitly. 12 F.3d at 1553. Rather, the Tenth Circuit's "healthy debtor" standard is entirely consistent with the language of the Code and with all the underlying Congressional goals and policies that the statute attempts to implement, and the Court would be inclined to follow it even if it were not binding.

 Of more immediacy is the citation to *Tolona Pizza* for the proposition that "the law should not push businessmen [sic] to agree upon a single set of billing practices; antitrust objections to one side, the relevant business and financial considerations vary widely among firms on both the buying and selling side of the market." 3 F.3d at 1033. Nothing in *Meridith Hoffman Partners* requires finding a single set of billing practices; the case only requires

finding what are the "ordinary" business practices of creditors and healthy debtors in the industry.[7] Thus, the Court also agrees with the large number of circuit courts that require a consideration of the "broad range" of business practices and arrangements that constitute "ordinary business terms". *E.g., Ganis Credit Corporation v. Anderson (In re Jan Weilert RV, Inc.)*, 315 F.3d 1192, 1197–98 (9th Cir.2003) (bankruptcy court was required to consider broad range of terms that encompassed practices employed by similarly situated debtors and creditors rather than considering only "average" transactions in the industry, citing, among other cases, *In re Roblin Industries*, 78 F.3d at 42). The broader point raised by those cases from several other circuits—that only aberrant business practices in the relevant industry should not be considered, as it was put by one court [8]—is completely consistent with the rule in the Tenth Circuit, and will be applied by this Court in this adversary proceeding.

DPI raises the important issue of what aspect of the industry to look at in determining what are "ordinary business terms". *Meridith Hoffman Partners* did not address in detail what the relevant industry was. The debtor in that case was a single-asset shopping center owner, 12 F.3d at 1552, and the creditor was a commercial real estate mortgage lender. *Id.* at 1554. The court merely recited that the "record shows that creditors in the industry use such an arrangement only in extraordinary circumstances, . . ." *Id.* In consequence, *Meridith Hoffman Partners* does not answer the specific question of whether, in this adversary proceeding, the

---

**7.** Pretty clearly that is a fact-intensive inquiry, which has been recognized by a number of courts. *E.g., Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.)*, 78 F.3d 30, 40 (2nd Cir.1996) (defining the relevant industry is a

question of fact "heavily dependent upon the circumstances of each individual case").

**8.** *Luper v. Columbia Gas of Ohio, Inc. (In re Carled)*, 91 F.3d 811, 818 (6th Cir.1996).

testimony should focus on the behavior of grocery retailers, or of suppliers of goods and services to retail grocers (assuming that is a different inquiry), or both, or, for that matter, some broader segment of the goods and services industry in general. For that reason, the Court will not rule at this stage on that issue, leaving it for further legal or factual development by the parties during or (preferably) before trial. Perhaps it is the case that, as DPI interprets Mr. Doyle's testimony, there are no healthy grocery retailers left in the United States, but that needs to be established as a fact before the Court addresses it further.

 To summarize, § 547(c)(2)(C) requires that DPI successfully raise and prove that the payments it defends were or are consistent with the (presumably broad) range of arrangements that take place between creditors and healthy debtors in the applicable segment of the industry.

*SUBSEQUENT NEW VALUE DEFENSE: SECTION 547(c)(4)*

 The purpose of the section 547(c)(4) defense is to encourage creditors to deal with troubled businesses. *Rushton v. E & S Int'l Enters., Inc. (In re Eleva, Inc.)*, 235 B.R. 486, 489 (10th Cir. BAP 1999).

> The exception of 547(c)(4) is intended to encourage creditors to work with troubled companies and to remove the unfairness of allowing the trustee to void all transfers made by the debtor to a creditor during the preference period without giving any corresponding credit for subsequent advances of new value to the debtor for which the preference defendant was not paid.

5 *Collier on Bankruptcy* ¶ 547.04[4][a], at 547–68.3.

 "In order to qualify for the new value defense, the creditor must prove: (1) new value was given to the debtor after the preferential transfer; (2) that the new value was unsecured; and (3) that it remained unpaid." *In re Eleva, Inc.*, 235 B.R. at 488–89 (*citing Mosier v. Ever–Fresh Food Co. (In re IRFM, Inc.)*, 52 F.3d 228 (9th Cir.1995)). For the purposes of section 547(c), a preferential transfer occurs on the date the check is delivered. *Id.* at 488. And, the creditor extends new value when goods are shipped. *Id.* at 489. "Subsequent advances of new value may be used to offset prior ... preferences. A creditor is permitted to carry forward preferences until they are exhausted by subsequent advances of new value." *Mosier*, 52 F.3d at 232. *See also Williams v. Agama Systems, Inc. (In re Micro Innovations Corp.)*, 185 F.3d 329, 336–37 (5th Cir.1999); *Crichton v. Wheeling Nat'l Bank (In re Meredith Manor, Inc.)*, 902 F.2d 257, 258 (4th Cir.1990).

*DISCUSSION OF FACTUAL ALLEGATIONS*

The Court finds that the following facts are not subject to genuine dispute:

(1) Furr's made payments to or for the benefit of DPI (Kefauver affidavit ¶¶ 4–6);

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made (Answers to Interrogatories 7 and 8, attached to Response.);

(3) made while the debtor was insolvent (insolvency is presumed under section 547(f) and Defendant has not introduced evidence to the contrary);

(4) made on or within 90 days before the date of the filing of the petition (Kefauver affidavit ¶¶ 4–6);

(5) that enables such creditor to receive more than such creditor would receive if (A) the case were a case under chapter 7 of this title; (B) the transfer had not been

made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title. (The Court takes judicial notice that the bankruptcy case will likely not even pay chapter 11 administrative expenses in full; therefore unsecured creditors will receive no dividend.)

(6) Defendant offered no evidence that would support a section 547(c)(1) defense of contemporaneous exchange for value. Plaintiff has established that the payments were made weeks or months after delivery of the product. Furthermore, DPI admits that the first check was applied to invoices 43 to 71 days old, the second check to invoices 43 to 57 days old, and the third and fourth checks to invoices 80 to 95 days old. Response, pp. 6–7. This establishes that the exchanges were in fact not substantially contemporaneous.

(7) Defendant offered no evidence that would contradict Plaintiff's schedule of payments to DPI and receipts of product from DPI with which it calculated the new value defense and net preference amount as set forth in the complaint. See Response to Interrogatories 3 and 4, attached to Response. DPI's 4th affirmative defense, that DPI provided goods after the final payment to DPI, is already taken into consideration in Exhibit 1 to the complaint, and Exhibit I to the Motion.

(8) As discussed above, it is not the Court's duty on a summary judgment motion to try the case, but rather to see if the case should go to trial. So, while there is an overwhelming body of evidence that supports the proposition that the Debtor was not operating under "ordinary business terms" during the preference period, Defendant cited some conflicting evidence in the record such that summary judgment should be denied on the ordinary course of business defense to the complaint. For example, DPI denies putting Furr's on credit hold. See Request for Admission 7.

*Compare* Plaintiff's fact 37, citing Smart depo at 131 (Exhibit E to Motion). The parties disagree on whether Furr's had a credit limit. See Smart depo at 132–33 (Exhibit E to Motion). *Compare* Interrogatory 13. DPI also argues in its Response that weekly payments were made during the prior year, which disagrees with the table attached to the complaint.

### CONCLUSION

In light of the foregoing analysis, the Court finds that Plaintiff has established all elements of a preferential transfer under section 547(b). It also finds that Defendant has not met its burden under section 547(g) to show that there is a genuine issue of fact with respect to either the contemporaneous exchange defense of section 547(c)(1) or the subsequent new value defense of section 547(c)(4), and those defenses will be overruled. In consequence, the remaining issue to be tried is DPI's ordinary course of business defense. An order consistent with this memorandum opinion will be entered.