In re H.L. HANSEN LUMBER COMPANY OF GALESBURG, INC., Debtor.

H.L. Hansen Lumber Company Of Galesburg, Inc., Plaintiff,

v.

G & H Custom Craft, Inc., Defendant.

Bankruptcy No. 00–81730.
Adversary No. 00–8174.

United States Bankruptcy Court, C.D. Illinois.

Oct. 16, 2001.

Sumner Bourne, Peoria, IL, for Plaintiff.

David A. Millage, Davenport, IA, for Defendant.

## *OPINION*

THOMAS L. PERKINS, Bankruptcy Judge.

This matter is before the Court for decision after trial on the adversary complaint of the Debtor in possession, H.L. HANSEN LUMBER COMPANY OF GALESBURG, INC. (DEBTOR), pursuant to Section 547 of the Bankruptcy Code, to recover payments made to the Defendant, G & H CUSTOM CRAFT INCORPORATED (G & H). It is not disputed that G & H received four payments from the DEBTOR totaling $4,696.72 within ninety days prior to the bankruptcy filing. The parties agree that against this amount G & H is entitled to a setoff for subsequent new value in the amount of $2,166.73, pursuant to Section 547(c)(4). The only issue is whether the payments to G & H made during the preference period qualify for the "ordinary course of business" exception.

## *FINDINGS OF FACT*

G & H manufactures custom-made laminated countertops. The DEBTOR operated a lumber and building supplies business

and purchased such countertops from G & H on an open account basis. G & H invoiced the DEBTOR for each order. The payment terms printed on the invoices are "net 30 days," meaning full payment is due within 30 days. The parties had no other agreement as to payment.

Each of the invoices paid during the preference period was paid late, ranging from 24 to 81 days late. On Feb. 28, 2000, within the ninety-day period preceding the filing of the DEBTOR'S Chapter 11 petition on May 30, 2000, G & H received a check dated February 23, 2000, from the DEBTOR in the amount of $530.29, in payment of the following eight invoices:

| Invoice # | Amount | Date of Invoice | Number of Days Between Date of Invoice & Payment |
|---|---|---|---|
| 5657 | $ 10.00 | 12/10/99 | 80 |
| 5658 | 281.60 | 12/10/99 | 80 |
| 5676 | 10.00 | 12/25/99 | 65 |
| 5677 | 76.00 | 12/25/99 | 65 |
| 5678 | 59.20 | 12/25/99 | 65 |
| 5709 | 10.00 | 12/28/99 | 62 |
| 5710 | 40.00 | 12/28/99 | 62 |
| FC 2239 | 43.49 | 12/31/99 | 59 |

On April 18, 2000, G & H received a check dated April 10, 2000, from the DEBTOR in the amount of $533.13, in payment of the following sixteen invoices:

| Invoice # | Amount | Date of Invoice | Number of Days Between Date of Invoice & Payment |
|---|---|---|---|
| 5758 | $ 10.00 | 1/13/00 | 96 |
| 5759 | 59.20 | 1/13/00 | 96 |
| 5760 | 10.00 | 1/13/00 | 96 |
| 5761 | 4.53 | 1/13/00 | 96 |
| 5782 | 10.00 | 1/27/00 | 82 |
| 5783 | 88.81 | 1/27/00 | 82 |
| 5784 | 115.86 | 1/27/00 | 82 |
| 5785 | 116.00 | 1/27/00 | 82 |
| 5786 | 10.00 | 1/27/00 | 82 |
| 5817 | 35.20 | 2/10/00 | 68 |
| 5818 | 10.00 | 2/10/00 | 68 |
| 5819 | 10.00 | 2/10/00 | 68 |
| 5849 | 10.00 | 2/24/00 | 54 |
| 5851 | 10.00 | 2/24/00 | 54 |
| 5852 | 10.00 | 2/24/00 | 54 |
| 5855 | 10.00 | 2/24/00 | 54 |

On May 3, 2000, G & H received a check dated April 20, 2000, from the DEBTOR in the amount of $2,202.19, in payment of the following six invoices:

| Invoice # | Amount | Date of Invoice | Number of Days Between Date of Invoice & Payment |
|---|---|---|---|
| 5762 | $907.13 | 01/13/00 | 111 |
| 5787 | 384.74 | 01/27/00 | 97 |
| 5820 | 486.03 | 02/10/00 | 83 |
| 5850 | 117.00 | 02/24/00 | 69 |
| 5853 | 144.56 | 02/24/00 | 69 |
| 5854 | 162.73 | 02/24/00 | 69 |

On June 5, 2000, G & H received a check dated May 10, 2000, from the DEBTOR in the amount of $1,431.11, in payment of the following five invoices:

| Invoice # | Amount | Date of Invoice | Number of Days Between Date of Invoice & Payment |
|---|---|---|---|
| 5856 | $339.87 | 02/24/00 | 102 |
| 5857 | 351.98 | 02/24/00 | 102 |
| 5858 | 578.71 | 02/24/00 | 102 |
| 5879 | 45.93 | 02/29/00 | 97 |
| 5880 | 114.62 | 02/29/00 | 97 |

Karen Hansen, the DEBTOR'S office manager, testified that the DEBTOR is on open account with all of its suppliers. Although she generally tried to comply with the G & H invoice terms by paying the account within thirty days, in the early months of 2000, it was sometimes forty-five days or more before the account might be paid. She testified that it was the DEBTOR'S practice to pay G & H's invoices in batches, grouping together a number of invoices and paying with a single check. According to her testimony, the DEBTOR did not change the way it did business with any of its suppliers prior to filing bankruptcy, though as the DEBTOR got closer to filing bankruptcy, the invoices were being paid with less frequency. She acknowledged that G & H was treated no differently than any of the DEBTOR'S other suppliers.

Daniel Sundholm, G & H's president and co-owner with his wife, testified that G & H had been in business for eighteen years. Prior to that time, he had worked for R & J Building Products for four and one-half years, a company engaged in the same line of business as G & H. Prior to that time, he had worked for his father's construction company for nine years. From his famil-

iarity with the billing practices of various suppliers of the lumber yard business when he worked for R & J in the mid-seventies, Mr. Sundholm testified that all of the lumber yards doing business with R & J were set up on open account, and paid a number of invoices at one time. He stated that G & H does business with a number of lumber yards similar to the DEBTOR, as well as ones both larger and smaller, and each one is on an open account. According to Mr. Sundholm, doing business on an open account is the standard of the industry.

Mr. Sundholm testified that the late payments received from the DEBTOR did not cause him concern, because 99.9% of G & H's open accounts get behind more than 30 days. He stated that it is standard in the business to let an account go more than thirty days, adding that Lowe's, a large chain, always runs 120 days late. He acknowledged that the DEBTOR'S account was characterized as overdue and that finance charges were imposed in late 1999. His wife, Dorothy Sundholm, G & H's office manager, testified that it is "standard" for all their customers, including the DEBTOR and other lumber companies it does business with, to go over thirty days before paying invoices.

Steven Mueller, the owner of a distributing company and former employee of Mueller Lumber Co., a family owned business, where he had worked for twenty-five years, also testified for G & H. He stated that Mueller Lumber dealt with all of its suppliers on an open account, paying several invoices at one time. After reviewing the DEBTOR'S checks in payment of G & H's invoices, he concluded that its practice was similar to that of Mueller Lumber. While Mueller Lumber often got behind in paying its invoices in its early years, in the later years, before it was sold, it always paid its bills within the 30–day invoice period. Though he assumed that the majority of lumber companies do not pay within 30 days, he had no direct knowledge of that fact.

## ANALYSIS

Although G & H stipulated that the elements of Section 547(b) were met with respect to four checks, including the check dated May 10, 2000, the evidence received at trial indicates that the "transfer" evidenced by the May 10, 2000 check occurred post-petition. In *Barnhill v. Johnson*, 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992), the Supreme Court held that for purposes of determining whether a transfer was made within the preference period under Section 547(b), a transfer by check occurs when the check is honored by the drawee bank. According to Exhibit D admitted at trial, the DEBTOR'S check dated May 10, 2000, was not received by G & H until June 5, 2000, six days after bankruptcy, and, presumably, was not paid by the DEBTOR'S bank until a day or more thereafter. Notwithstanding that post-petition transfers are not avoidable as preferences under Section 547, based upon G & H's stipulation, the Court will treat this fourth payment as if the transfer occurred pre-petition.

The ordinary course of business defense is set forth at Section 547(c)(2) as follows:

(c) The trustee may not avoid under this section a transfer—

\*   \*   \*   \*   \*   \*

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

11 U.S.C. § 547(c)(2). The creditor asserting the defense has the burden to prove each element by a preponderance of the evidence. 11 U.S.C. § 547(g); *Matter of Midway Airlines, Inc.,* 69 F.3d 792, 797 (7th Cir.1995). If the creditor fails to prove any of the three elements, the defense is inapplicable.

■ The appropriate date to be used in determining whether a transfer by check was made in the ordinary course of business is not the same as that used for purposes of Section 547(b). The Supreme Court in *Barnhill v. Johnson, supra,* noted that a different rule had been applied under this provision, and that for purposes of Section 547(c), the proper date to consider is the date the check is received by the creditor. Recent cases have adhered to this rule, and that is the date the Court will use in analyzing the DEBTOR'S payment history. *In re Air South Airlines,* 247 B.R. 165 (Bankr.D.S.C.2000); *In re Tennessee Valley Steel Corp.,* 203 B.R. 949 (Bankr.E.D.Tenn.1996).

The DEBTOR does not dispute that the first element of the defense is satisfied. The DEBTOR contends that G & H failed to prove the second and third prongs. Subsection (B) is a subjective test that examines whether the transfers at issue were ordinary as between the parties. Subsection (C) is an objective test that examines whether the transfers were ordinary in the industry.

■ When applying the subjective test of subsection (B), courts compare transfers from the pre-preference period with transfers during the preference period and weigh the following five primary factors:

(1) the length of time the parties were doing business together;

(2) whether the amount or form of payments differed from past practices;

(3) whether the creditor engaged in any unusual collection activity;

(4) the circumstances under which the payments were made; and

(5) the timing of the payments.

*See, In re Tulsa Litho Company,* 229 B.R. 806, 809 (10th Cir. BAP 1999); *In re C.J. Spirits, Inc.,* 238 B.R. 889 (Bankr.M.D.Fla. 1999). Late payments may still be subjectively ordinary if the parties had a history of making and accepting late payments. *Matter of Tolona Pizza Products Corp.,* 3 F.3d 1029 (7th Cir.1993).

■ The parties did business together for several years prior to the DEBTOR'S bankruptcy. There is no evidence that G & H engaged in any unusual collection activity. Neither is there any evidence of any unusual or suspicious circumstances surrounding the payments in question. The payments were all regularly made by uncertified checks drawn on the DEBTOR'S business checking account.

With respect to the subjective test, G & H argues that (1) it was the ordinary practice of G & H to sell countertops to the DEBTOR on an open account basis, (2) it was the ordinary practice of the DEBTOR to pay G & H's invoices in batches, and (3) it was ordinary that the DEBTOR would pay the invoices late, i.e., beyond thirty days.

The evidence wholly supports the first two arguments and supports the third argument to a limited extent. The testimony of Karen Hansen and Daniel Sundholm was uncontradicted that G & H continuously sold to the DEBTOR on an open account basis and that the DEBTOR consistently followed a practice of paying G & H's invoices in batches, usually batching a month's invoices together. Based on this evidence, the Court finds that the "open

account" and "batching" practices were subjectively ordinary between the parties.

The more problematic issue for G & H is whether the timing of the preference period payments falls within the range of ordinariness when measured against the pre-preference period payments. G & H argues that the timing ought to be analyzed by batch rather than by individual invoice date.

The DEBTOR customarily paid a month's worth of invoices within the following two-month period.[1] For example, G & H sent thirteen invoices dated in February, 1999, which were all paid by the DEBTOR with one check which G & H received on May 3, 1999; the check in payment of the March, 1999 invoices was received by G & H on May 17, 1999; and a check in payment of April's invoices was received on June 3, 1999. During the pre-preference period, the latest that a month's batch of invoices was paid was when the October, 1999 invoices were paid by receipt of a check on January 19, 2000, two months and nineteen days after the end of the invoice month.

With regard to the preference period payments, G & H sent eight invoices dated in December, 1999, which were all paid by the DEBTOR with one check received by G & H on February 28, 2000. Thereafter, the DEBTOR began to deviate from its regular practice of paying a month's invoices all at once. Most of the January and February, 2000 invoices were accumulated in two mixed batches. G & H received a check on April 18, 2000, in payment of the first mixed batch and received

a second check on May 3, 2000 in payment of the second mixed batch. A check in payment of the remaining February invoices was received on June 5, 2000. All of the invoices paid in June and the two January, 2000 invoices that were paid with the check received on May 3, 2000, were paid later than the outside limit of two months and nineteen days established during the pre-preference period, when analyzed on a monthly batch basis.

The payment timing issue may also be analyzed by un-batching the invoices and viewing the transactions on an invoice-by-invoice basis. Because the DEBTOR, during the preference period, deviated from its established practice of paying an entire month's invoices with one check, the Court is of the opinion that the payment timing issue is properly analyzed, not based on the timing of batch payments, but by charting the age of each individual invoice at the time that the DEBTOR'S check was received by G & H. For the payments made from April, 1999 through October, 1999, the oldest invoice paid was 74 days. Beginning with the November 30, 1999 payment, approximately three months prior to the beginning of the preference period, the aging increased. The November 30 payment paid, for the first time, invoices older than 74 days, specifically, invoices 123 days old, 82 days old and 77 days old. The January 19, 2000 payment includes invoices paid 97 days, 91 days, 82 days and 80 days old.

The question these facts present is as follows: Where the DEBTOR has a relatively long-standing pattern of paying in-

1. Though the parties' business relationship had existed for a number of years prior to the bankruptcy, this Court's analysis of the DEBTOR'S payment history is limited to the period beginning with invoices dated Feb. 23, 1999, for that is all that may be compiled from the exhibits admitted at trial. Absent any evidence that the parties' dealings prior to that time deviated from the pattern established during that period, those invoices and payments establish a baseline of dealings against which to compare the transfers during the preference period at issue here.

voices within 74 days of their date, which aging increases during the three-month period preceding the preference period, should the Court include those increased time-spans as part of the ordinary baseline between the parties for the pre-preference period? Addressing this same issue in *In re Hancock–Nelson Mercantile Co., Inc.*, 122 B.R. 1006, 1013 (Bankr.D.Minn.1991) and answering the question in the negative, the court stated:

> The goal of the inquiry under § 547(c)(2)(B), of course, is to establish a "baseline" of dealings with "reasonable, ascertainable boundaries," *In re Loretto Winery, Ltd.*, 107 B.R. [707] at 710 [(9th Cir. BAP 1989)]; otherwise, no meaningful, accurate comparison of the subject transaction(s) can be made. The only way in which § 547(c)(2)(B) can have a truly normative function is by establishing a "baseline" of dealings, fixed at least in part during a time in which the debtor's day-to-day operations were "ordinary" in the layman's sense of the word. Preferably, the material period should extend back into the time before the debtor became financially distressed
> . . . .

The 7th Circuit in *Tolona Pizza* echoes that philosophy:

> [T]he most important thing is not that the dealings between the debtor and the allegedly favored creditor conform to some industry norm but that they conform to the norm established by the debtor and the creditor in the period before, *preferably well before*, the preference period. (Emphasis added).

3 F.3d at 1032.

In this case, based on all of the evidence, this Court finds that those increasingly late payments of 75 days and more that were made within three months of the beginning of the preference period marked the beginning of the DEBTOR'S slide into bankruptcy, were outside the well-established range of ordinariness and, based upon the court's reasoning in *Hancock–Nelson*, should be excluded. Therefore, the outer limit of the accepted range of ordinary payments as established by the parties' course of dealing, for pre-preference period purposes, is 74 days. Perfect conformance should not be required, however, for it would be "ill-advised to rely too heavily upon a difference of a few days." *In re Tennessee Chemical Co.*, 112 F.3d 234, 237 (6th Cir.1997). This Court believes an expansion of the actual outer limit by 10% (7 days) properly effects this policy. Accordingly, the DEBTOR'S payment, during the ninety days before bankruptcy, of invoices more than 81 days old is not subjectively ordinary based upon the past practice of the parties and fails the Section 547(c)(2)(B) test. Of the thirty-five invoices paid during the preference period, seventeen invoices totaling $3,633.41 were older than 81 days. Only the payments made on the other eighteen invoices that were paid within 81 days are subjectively ordinary and meet the test of subsection (B).

■ G & H must also establish that those eighteen invoices meet the test of subsection (C). The Seventh Circuit first addressed the meaning of Section 547(c)(2)(C) in *Matter of Tolona Pizza Products Corp.*, 3 F.3d 1029 (7th Cir.1993), where it concluded that "ordinary business terms" "refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection (C)." 3 F.3d at 1033. The *Tolona Pizza* bankruptcy court found that the transferee, by failing to introduce evidence of the credit practices of others in

the industry, failed to prove that the late payments fit within industry norms.[2] The Seventh Circuit nonetheless affirmed the district court's finding that the testimony of the transferee's own employee was sufficient to establish the credit practices followed in the industry.

The Seventh Circuit further clarified this issue in *In re Midway Airlines, Inc.*, 69 F.3d 792 (7th Cir.1995). After reiterating that the proper inquiry under Section 547(c)(2)(C) focuses on the credit practices of the *creditor's competitors*, the court noted three types of evidence typically used as proof:

1) evidence procured directly from competitors, presumably the testimony of current or former employees of competitors;

2) the testimony of expert witnesses concerning industry credit practices, and;

3) the testimony of the transferee's own employees, if any, who have personal knowledge of the credit practices used by competitors.

The court expressly rejected the transferee's reliance solely on evidence of its own practices:

Reliance solely on the experience of the creditor renders ineffectual the important dichotomy between the subjective requirements of 11 U.S.C. § 547(c)(2)(A)-(B), which can be satisfied through proof of the parties' own dealings, and the objective requirement imposed by 11 U.S.C. § 547(c)(2)(C), which requires reference to some external datum.

69 F.3d at 797–98.

Applying this standard to the evidence adduced at trial, this Court concludes that G & H's evidence was insufficient to carry its burden under Section 547(c)(2)(C). G

& H failed to produce a witness who had current knowledge of the credit practices engaged in by G & H's competitors. In fact, its "industry" was never defined and its competitors were never identified. Mrs. Sundholm's testimony was directed only to G & H's own dealings with its own customers. · Mr. Mueller had been employed by Mueller Lumber, a competitor of the DEBTOR, not of G & H, and his testimony focused on the practices of lumber yards. His testimony did not address the credit practices of G & H's competitors.

■ Mr. Sundholm did testify about his personal knowledge of the credit practices of R & J Building Products, a company in the same business as G & H. However, he had not worked for R & J for eighteen years. His experience with R & J is simply too stale to satisfy, by itself, the evidentiary requirements mandated by *Midway Airlines*. Apart from being stale, his testimony based upon his R & J experience did not address, with any specificity, just how late invoices may be paid and still be within the ordinary industry payment range. It is incumbent upon the party asserting the ordinary course defense to establish the "outer limits" of normal industry practices. *Matter of Tolona Pizza Products Corp., supra*, at 1033. Mr. Sundholm made a conclusory statement that he was familiar with billing practices in the industry and that it was standard in the industry to let an account go beyond the 30–day payment terms. There was no evidence that his knowledge of the "industry" practices derived from anything other than his experience at G & H and R & J. Even if he had personal knowledge beyond those two sources, he neither defined the "industry" nor gave an opinion as to the outer limit of how late invoices are ordinarily

---

**2.** *See,* discussion at 1033–34 (Flaum, C.J., dissenting).

paid in the industry. His testimony was not supported by any specific data and was not referenced to any particular G & H competitor or group of competitors. This Court finds that his testimony was insufficient to prove industry practice. The record is devoid of the necessary evidence of the current credit practices of G & H's competitors.

Because G & H failed to introduce the kind of evidence necessary to meet its burden under Section 547(c)(2)(C), the Court does not need to address the thorny issue of exactly how the industry should be defined. *See, e.g., In re DeMert & Dougherty, Inc.,* 232 B.R. 103 (N.D.Ill.1999). G & H makes laminated countertops. To define the relevant industry as "manufacturers of laminated countertops" seems a bit narrow given the *Tolona Pizza* admonition that it includes "firms similar in some general way to the creditor." In any event, G & H did not present evidence that enables the Court to define the relevant industry for purposes of subsection (C) or determine how late invoices may be paid and still be ordinary within the industry. Because G & H failed to prove its third element, the ordinary course of business defense is inapplicable and does not protect the payments made on the eighteen invoices that passed the subjective test of subsection (B).

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

### ORDER

For the reasons stated in an Opinion entered this day, IT IS HEREBY ORDERED that judgment on the DEBTOR'S Complaint is entered in FAVOR of the DEBTOR and AGAINST G & H in the amount of $2,529.99, plus costs and pre-

judgment interest at the rate of 6.05% from November 22, 2000.