In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-2356

THE UNSECURED CREDITORS COMMITTEE
OF SPARRER SAUSAGE COMPANY, INC.,

*Plaintiff-Appellee,*

*v.*

JASON'S FOODS, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 14 C 7879 — **Ronald A. Guzmán**, *Judge.*

ARGUED DECEMBER 7, 2015 — DECIDED JUNE 10, 2016

Before FLAUM, WILLIAMS, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. During the 90-day preference period preceding its Chapter 11 bankruptcy filing, Sparrer Sausage Company paid invoices it received from Jason's Foods, Inc., one of its suppliers, totaling roughly $587,000. The Unsecured Creditors Committee asked that these payments be returned to the bankruptcy estate as avoidable preferences under § 547(b) of the Bankruptcy Code. Jason's Foods agreed

that the payments were avoidable preferences but claimed an exception under 11 U.S.C. § 547(c)(2)(A) for otherwise preferential transfers made in the ordinary course of business.

The bankruptcy judge allowed Jason's Foods to keep a significant share of the challenged payments but held that the timing of certain payments departed too drastically from the companies' past practice to be considered ordinary. The judge imposed preference liability on Jason's Foods for 11 invoices that he determined were paid either too early or too late to be treated as ordinary—specifically, invoices Sparrer Sausage paid within 14, 29, 31, 37, and 38 days of issuance. The district court affirmed and Jason's Foods appealed.

We reverse. Nothing in the record suggests that it was unusual for Sparrer Sausage to pay invoices from Jason's Foods within 14, 29, and 31 days of issuance given its payment history before the preference period. The only payments that can fairly be deemed out of the ordinary are those made 37 and 38 days after receipt of invoice. Jason's Foods' preference liability is limited to those invoices and is entirely offset by invoices Sparrer Sausage failed to pay.

## I.  Background

Jason's Foods, a wholesale meat supplier, provided unprocessed meat products to Chapter 11 debtor Sparrer Sausage, a sausage manufacturing company. Their relationship stretched back as far as February 2, 2010, and continued until Sparrer Sausage filed its petition for Chapter 11 bankruptcy on February 7, 2012. During the 90-day preference

period preceding this filing, Sparrer Sausage paid 23 invoices from Jason's Foods totaling $586,658.10.

In September 2013 the Unsecured Creditors Committee filed a complaint to recover those payments from Jason's Foods. The Committee argued that the payments were avoidable preferences—payments that Jason's Foods was required to return to the bankruptcy estate for the benefit of Sparrer Sausage's unsecured creditors. *See* 11 U.S.C. § 547(b). Jason's Foods conceded that the payments met the statutory definition of an avoidable preference but asserted two affirmative defenses under § 547(c). First, Jason's Foods argued that the otherwise preferential transfers were made in the ordinary course of business and thus were nonavoidable under § 547(c)(2). Alternatively, Jason's Foods argued that it had provided meat products to Sparrer Sausage in January and February of 2012 without receiving payment and that this new value offset its preference liability under § 547(c)(4).

The bankruptcy judge first considered Jason's Foods' ordinary-course defense and determined that before the preference period, Sparrer Sausage generally paid invoices from Jason's Foods within 16 to 28 days. Of the 23 invoices that Sparrer Sausage paid during the preference period, 12 fell within this range, so the judge concluded that these 12 payments were ordinary and thus nonavoidable. The remaining 11 invoices were paid within 14, 29, 31, 37, and 38 days of the invoice date. The judge concluded that these payments, which totaled $306,110.23, were not ordinary and must be returned to the bankruptcy estate for the benefit of Sparrer Sausage's unsecured creditors.

Turning next to the new-value defense, the judge found that Sparrer Sausage had not paid for $63,514.91 worth of meat products it received from Jason's Foods in January and February of 2012. The judge credited that amount to Jason's Foods as an offset against its preference liability and entered judgment in favor of the Unsecured Creditors Committee in the amount of $242,595.32. The judgment was affirmed on appeal to the district court, and this appeal followed.

## II. Discussion

We review the bankruptcy court's conclusions of law de novo and its findings of fact for clear error. *Kovacs v. United States*, 614 F.3d 666, 672 (7th Cir. 2010). A factual finding is clearly erroneous if "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (quotation marks omitted).

As a general rule, payments made to a creditor during the 90-day period before a debtor files for bankruptcy are avoidable preferences. *See* 11 U.S.C. § 547(b). The rule prevents inequitable distribution of the debtor's assets to favored creditors and protects the struggling debtor against the predatory behavior of nervous creditors. *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1032 (7th Cir. 1993). But the rule contains an exception, codified in § 547(c)(2), aimed at "leav[ing] undisturbed normal commercial and financial relationships and protect[ing] recurring, customary credit transactions." *Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 642 (7th Cir. 2003) (quotation marks omitted).

To that end, § 547(c)(2) provides that an otherwise preferential transfer is nonavoidable

> to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—
>
> > (A) made in the ordinary course of business or financial affairs of the debtor and transferee; or
> >
> > (B) made according to ordinary business terms[.]

The creditor asserting this defense to preference liability bears "the burden of proving the nonavoidability of a transfer under subsection (c)." 11 U.S.C. § 547(g).

Jason's Foods and the Unsecured Creditors Committee stipulated that Sparrer Sausage incurred all debts owed to Jason's Foods in the ordinary course of business, so we're concerned only with Sparrer Sausage's payment of those debts. In this regard Jason's Foods proceeds under § 547(c)(2)(A), commonly referred to as the subjective ordinary-course defense.[1]

---

[1] Prior to its amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, § 547(c)(2) required a creditor to prove *both* that the transfer was made in the ordinary course of business between the debtor and the creditor *and* that the transfer was made according to ordinary business terms. 11 U.S.C. § 547(c)(2) (2003); *Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 641–42 (7th Cir. 2003). These requirements are commonly referred to as the subjective and objective components of the ordinary-course defense. The 2005 amendments made these components disjunctive. Pub. L. No. 109-8, § 409, 119 Stat. 23, 106 (2005).

The subjective ordinary-course defense asks whether the payments the debtor made to the creditor *during* the preference period are consistent with the parties' practice *before* the preference period. *Tolona Pizza*, 3 F.3d at 1032. The inquiry is not governed by any "'precise legal test,'" *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir. 1991) (quoting *In re Fulghum Constr. Corp.*, 872 F.2d 739, 743 (6th Cir. 1989)), but generally entails using the debtor's payment history to calculate a baseline for the companies' dealings and then comparing preference-period payments to that baseline, *cf. Kleven*, 334 F.3d at 642–43. While "substantial deviations from established practices" are not protected, the ordinary-course defense "allow[s] suppliers and other furnishers of credit to receive payment within the course that has developed in the commercial relationship between the parties." *In re Tenn. Chem. Co.*, 112 F.3d 234, 238 (6th Cir. 1997).

Jason's Foods challenges the bankruptcy judge's determination that Sparrer Sausage typically paid invoices within 16 to 28 days, arguing that this calculation does not accurately reflect the companies' payment practices before the preference period. This is really two arguments in one. Jason's Foods challenges the judge's use of an abbreviated historical period rather than the companies' entire payment history and also argues that the baseline comprises a too-narrow range of days surrounding the average invoice age during the historical period.

## A. Historical Period

Calculating the baseline payment practice between two companies requires identifying a historical period that reflects the companies' typical payment practices. *See, e.g., In*

*re Quebecor World (USA), Inc.*, 491 B.R. 379, 387 (Bankr. S.D.N.Y. 2013) ("The Court must first determine the appropriate pre-preference time period to use in establishing a baseline of dealings between the parties."). In *Tolona Pizza* we directed courts to look to "the norm established by the debtor and the creditor in the period before, preferably well before, the preference period." 3 F.3d at 1032. That directive doesn't require truncating the historical period "well before" the beginning of the preference period but simply underscores that the baseline should reflect payment practices that the companies established before the onset of any financial distress associated with the debtor's impending bankruptcy. *See In re Affiliated Foods Sw. Inc.*, 750 F.3d 714, 720 (8th Cir. 2014) ("To make a sound comparison, '[n]umerous decisions support the view that the historical baseline should be based on a time frame when the debtor was financially healthy.'" (quoting *Quebecor World*, 491 B.R. at 387)).

In some cases this may require truncating the historical period before the start of the preference period if the debtor's financial difficulties have already substantially altered its dealings with the creditor. *See, e.g.*, *In re Circuit City Stores, Inc.*, 479 B.R. 703, 710 (Bankr. E.D. Va. 2012); *In re H.L. Hansen Lumber Co. of Galesburg, Inc.*, 270 B.R. 273, 279 (Bankr. C.D. Ill. 2001). In other cases it will be necessary to consider the entire pre-preference period. *See, e.g.*, *Affiliated Foods*, 750 F.3d at 720; *Quebecor World*, 491 B.R. at 387. In all cases the contours of the historical period should be grounded in the companies' payment history rather than dictated by a fixed or arbitrary cutoff date. *Accord Affiliated Foods*, 750 F.3d at 720 ("Obviously, when considering this type of fact-intensive issue, what is appropriate in one case is not necessarily appropriate in the next case.").

Here, Jason's Foods and the Unsecured Creditors Committee stipulated to a historical period spanning February 2, 2010, to November 7, 2011, which encompassed all 235 invoices that Sparrer Sausage paid before the preference period. Sparrer Sausage paid these invoices within 8 to 49 days, with an average invoice age of almost 25 days at the time of payment. The bankruptcy judge disregarded this stipulation. Citing the increasing lateness of payments after April 15, 2011, the judge considered only the 168 invoices that Sparrer Sausage paid prior to that date. Sparrer Sausage paid these invoices within 8 to 38 days, with an average invoice age of 22 days.

Jason's Foods argues that the bankruptcy judge's decision to truncate the historical period approximately seven months before the start of the preference period was clearly erroneous. We disagree. The judge determined that April 15, 2011, "mark[ed] the beginning of the debtor's financial difficulties" and that invoices paid after that date did not accurately reflect the norm when Sparrer Sausage was financially healthy. That finding is not without support in the record. Prior to April 15, 2011, Sparrer Sausage made its latest payments 38 days after the invoice date; after April 15, 2011, Sparrer Sausage paid numerous invoices 40 or more days after the invoice date, with some as late as 45 days. Moreover, the percentage of invoices that Sparrer Sausage paid 30 or more days after issuance increased from 5.95% between February 2, 2010, and April 15, 2011, to 46.3% between April 16, 2011, and November 7, 2011.

We acknowledge that the evidence of Sparrer Sausage's financial distress after April 15, 2011, is hardly overwhelming, and we question the judge's decision to disregard the

parties' stipulation. Sparrer Sausage did not experience a marked "liquidity crisis" or other stark change in its payment practices after April 15, 2011. *Circuit City*, 479 B.R. at 710; *see also Hansen Lumber*, 270 B.R. at 278–79. But the bankruptcy judge offered a reasoned explanation for his decision, and his reasons were grounded in Sparrer Sausage's payment history and supported by the record. Accordingly, we cannot say that the judge's decision to truncate the historical period after April 15, 2011, was clear error.

## B. Baseline of Dealings During the Historical Period

Using the truncated historical period of February 2, 2010, to April 15, 2011, the judge determined that Sparrer Sausage typically paid invoices from Jason's Foods within 16 to 28 days. He arrived at this baseline by calculating the average invoice age during the historical period (22 days) and adding 6 days on both sides of that average. Jason's Foods argues that the judge should have used the total range of invoice ages during the historical period—8 to 38 days—as the baseline. We agree that the judge erred in this step of the analysis, but only in part. The judge's choice of methodology was sound, but the application was flawed.

Bankruptcy courts typically calculate the baseline payment practice between a creditor and debtor in one of two ways: the average-lateness method or the total-range method. The average-lateness method uses the average invoice age during the historical period to determine which payments are ordinary, while the total-range method uses the minimum and maximum invoice ages during the historical period to define an acceptable range of payments. *See Quebecor World*, 491 B.R. at 387–88.

Each of these methodologies has strengths and weaknesses, and the decision to apply one or the other rests within the bankruptcy judge's discretion. While the average-lateness method better compensates for outlier payments during the historical period, the total-range method often provides a more complete picture of the relationship between the creditor and debtor. *Compare id.* (rejecting the total-range method because "that proposed methodology captures outlying payments that skew the analysis of what is ordinary"), *with In re Am. Home Mortg. Holdings, Inc.*, 476 B.R. 124, 138 (Bankr. D. Del. 2012) (applying the total-range method because the average invoice age did not "'portray the complete picture' of the payment history" between the creditor and debtor).

We see no reason to disturb the bankruptcy judge's decision to use the average-lateness method rather than the total-range method here. Admittedly none of the invoices that Sparrer Sausage paid during the historical period appear to be such extreme outliers that they would skew the baseline calculation. *See In re Moltech Power Sys., Inc.*, 327 B.R. 675, 681 (Bankr. N.D. Fla. 2005) ("[C]ommon sense would seem to indicate that the court should be hesitant to embrace analysis by range when so doing would incorporate aberrations that artificially widen the range, thus presenting an inaccurate portrait of the actual ordinary course of business between the parties."). But that's not enough, standing alone, to upset the judge's determination that the average-lateness method would better capture Jason's Foods and Sparrer Sausage's payment relationship.

The judge's *application* of the average-lateness method is more problematic. He began by observing that the average

invoice age rose from 22 days during the historical period to 27 days during the preference period. We're skeptical that a five-day difference in the average invoice age is substantial enough to take any of the preference-period payments outside the ordinary course. Bankruptcy courts have deemed comparable deviations immaterial and held that all preference-period payments were ordinary on this basis. *In re Archway Cookies*, 435 B.R. 234, 244 (Bankr. D. Del. 2010) (4.9-day difference); *In re Am. Camshaft Specialties, Inc.*, 444 B.R. 347, 356 (Bankr. E.D. Mich. 2011) (4-day difference). That said, a discrepancy that is immaterial in the context of one business relationship might well be aberrational in the context of another. *Accord In re Jeffrey Bigelow Design Grp., Inc.*, 956 F.2d 479, 486 (4th Cir. 1992) (recognizing that the "'focus of [the] inquiry must be directed to an analysis of the business practices which were unique to the particular parties under consideration'" (quoting *In re Fulghum Constr. Corp.*, 872 F.2d at 743)). Given the fact-intensive, context-specific nature of the ordinary-course defense, we are unwilling to upset the judge's decision on this basis.

But the judge's subsequent finding—that invoices paid more than 6 days on either side of the 22-day average were outside the ordinary course—was clear error. The judge applied *Quebecor World* and its so-called "bucketing" analysis to support this conclusion, but neither the facts nor the bankruptcy court's analysis in that case bear any resemblance to this case. In *Quebecor World* the average invoice age during the historical period was 27.56 days, while the average invoice age during the preference period was 57.16 days—a difference of nearly 30 days. 491 B.R. at 388. Given such a stark disparity, the bankruptcy court grouped historical-period invoices "in buckets by age." *Id.* That analysis

revealed that the debtor paid 88% of invoices during the historical period within 11 to 40 days after the invoice date. Expanding this range by five days on the high end, the court determined that any invoices paid more than 45 days after the invoice date were outside the ordinary course. *Id.*

Here a 16-to-28-day baseline range encompasses just 64% of the invoices that Sparrer Sausage paid during the historical period. Even more problematically, the judge offered no explanation for the narrowness of this range. Why exclude invoices that Sparrer Sausage paid within 14 days when these payments were among the most common during the historical period? The same goes for invoices that Sparrer Sausage paid within 29 days. Indeed by adding just two days to either end of the range, the analysis would have captured 88% of the invoices that Sparrer Sausage paid during the historical period, a percentage much more in line with the *Quebecor World* analysis. Thus, a 16-to-28-day baseline appears not only excessively narrow but also arbitrary.

Sparrer Sausage paid 9 of the 11 contested invoices within 14, 29, and 31 days of issuance. These payments fall either squarely within or just outside the 14-to-30-day range in which Sparrer Sausage paid the vast majority of invoices during the historical period. As such they are precisely the type of payments that the ordinary-course defense protects: recurrent transactions that generally adhere to the terms of a well-established commercial relationship. Sparrer Sausage paid the other 2 invoices 37 and 38 days after they were issued, which is substantially outside the 14-to-30-day baseline. We conclude that Jason's Foods' preference liability is limited to these payments, which total $60,679.00.

**C. New-Value Defense**

Finally, we turn briefly to Jason's Foods' new-value defense. Under § 547(c)(4), a preferential transfer is offset "to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor." A creditor may avail itself of this defense if, after receiving a preferential transfer from the debtor, it advanced additional, unsecured credit that remains unpaid. *In re Prescott*, 805 F.2d 719, 727 (7th Cir. 1986). The premise underlying the new-value defense is that by extending new value to the debtor without receiving payment, the creditor has effectively replenished the bankruptcy estate in the same way that returning a preferential transfer would. *In re Globe Bldg. Materials, Inc.*, 484 F.3d 946, 950 (7th Cir. 2007).

It's undisputed that Jason's Foods supplied $63,514.00 worth of meat products to Sparrer Sausage between January 18, 2012, and February 6, 2012, well after Sparrer Sausage paid at least some invoices during the preference period. The parties also agree that Sparrer Sausage never paid Jason's Foods for these products. Jason's Foods is therefore entitled to a reduction of its preference liability in this amount. *See* 5 COLLIER ON BANKRUPTCY ¶ 547.04[4][e] at 565–69 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2015) (noting that § 547(c) defenses may be used cumulatively). Because the new value that Jason's Foods extended to Sparrer Sausage ($63,514.00) exceeds its remaining preference liability ($60,679.00), that liability is entirely offset.

REVERSED AND REMANDED.