In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 16-1940 & 16-2094

IN RE:

ONESTAR LONG DISTANCE, INC.,

*Debtor*.

ELLIOTT D. LEVIN, as Chapter 7 Trustee
For OneStar Long Distance, Inc.,

*Plaintiff-Appellant/*
*Cross-Appellee*,

*v.*

VERIZON BUSINESS GLOBAL, LLC,

*Defendant-Appellee/*
*Cross-Appellant*.

_____

Appeals from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 3:15-cv-00049-RLY-DKL — **Richard L. Young**, *Judge*.

_____

ARGUED NOVEMBER 29, 2016 — DECIDED SEPTEMBER 22, 2017

_____

Before POSNER,[*] EASTERBROOK, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Telecommunications retailer OneStar paid MCI, one of its wholesale suppliers, roughly $1.9 million during the 90 days before one of OneStar's creditors forced it into bankruptcy. OneStar's bankruptcy trustee sought to recapture those payments under § 547(b) of the Bankruptcy Code, which generally allows debtors to avoid (i.e., reverse) payments made during the 90 days before bankruptcy. This is known as the preference period.

Verizon purchased MCI and entered the action as its successor. Verizon conceded that the payments met the requirements of § 547(b) but asserted two affirmative defenses under 11 U.S.C. § 547(c). It argued that the payments were unavoidable because (1) MCI offset them by subsequently providing OneStar with new value in the form of additional telecommunications services, and (2) the payments occurred in the ordinary course of business.

In response to the new-value argument, the trustee contended that OneStar had compensated MCI for its new-value services, canceling out that new value and nullifying the defense. Specifically, one week before the bankruptcy filing, OneStar assigned the privileges and debt from its contract with MCI to a newly formed affiliate in order to avoid creditors. The trustee maintained that this effectively compensated MCI by releasing it from its contractual obligations to OneStar. MCI was now obligated to provide services to

---

[*] Circuit Judge Posner retired on September 2, 2017, and did not participate in the decision of this case, which is being resolved by a quorum of the panel under 28 U.S.C. § 46(d).

the affiliate, not to OneStar itself, though the affiliate in turn relayed those services to OneStar.

The bankruptcy judge rejected Verizon's ordinary-course defense but ruled that the new value MCI advanced during the preference period sufficed to make OneStar's preferential payments unavoidable under § 547(c)(4); the debt assignment to the newly formed affiliate was irrelevant. The district judge affirmed the new-value ruling and did not address the ordinary-course defense. The trustee appealed. Verizon filed a cross-appeal contesting the rejection of its ordinary-course defense.

We affirm. A debtor's assignment of debt and contractual rights to an affiliate doesn't have the effect of repaying a creditor for new value. MCI advanced subsequent new value that remained unpaid, so OneStar's preferential transfers are unavoidable. That conclusion makes it unnecessary to address Verizon's cross-appeal.

## I. Background

In April 2002 OneStar and MCI entered into a contract requiring MCI to provide OneStar with certain telecommunications services. MCI billed its "switched" services (those that involved connecting calls from one line to another) at a variable usage rate, while its "unswitched" services (long-haul services that didn't require switching) carried a fixed monthly charge.

On December 31, 2003, a creditor filed an involuntary Chapter 7 bankruptcy petition against OneStar. MCI had provided OneStar with switched and unswitched services throughout the 90-day preference period preceding that date. MCI billed OneStar on a monthly basis, invoicing

approximately $1.3 million in October, $1.3 million in November, and $1.1 million in December (for a sum of approximately $3.7 million). During that time, OneStar paid MCI $1,900,012.81 on those invoices (the amount the trustee now seeks to recover). The total debt OneStar owed to MCI grew from around $7.5 million at the beginning of the preference period to more than $9.8 million near its end.

A pivotal moment in OneStar's slide into bankruptcy came in October 2003 when its senior secured lender sent it a default notice. At that point OneStar's principals decided to move business to a newly formed affiliate, IceNet, in order to avoid creditors. IceNet's management composition mirrored OneStar's. On December 22 OneStar, MCI, and IceNet entered into an agreement assigning OneStar's contractual privileges and debt to IceNet. The agreement placed IceNet in between OneStar and MCI: OneStar now owed IceNet; IceNet owed MCI; and MCI was obligated to provide IceNet with the services specified in its 2002 contract with OneStar. From December 23 until December 31, IceNet received services from MCI and relayed them to OneStar. This scheme to avoid OneStar's creditors was foiled by the filing of the involuntary bankruptcy petition.

In bankruptcy court OneStar's trustee sought to avoid the prepetition payments to MCI as preferential transfers under § 547 of the Bankruptcy Code. The parties stipulated that the trustee established § 547(b)'s prima facie requirements for avoidance. But Verizon asserted that the preferential payments were unavoidable because MCI provided OneStar with new value—the services corresponding to the fall 2003 invoices—after receiving those payments. *See* 11 U.S.C. § 547(c)(4). Verizon also raised an additional affirmative

defense that the payments were made in the ordinary course of business. *See id.* § 547(c)(2).

Addressing the new-value defense, the bankruptcy judge used the monthly invoice records to estimate the dates of MCI's new-value advances by assigning to each day the daily average of its monthly total. This per diem analysis suggested that MCI advanced enough new value after its receipt of OneStar's preferential transfers to cover the amount of those transfers. The judge further held that OneStar's debt assignment did not compensate MCI for the new value and that Verizon, as MCI's successor, was therefore entitled to a complete new-value defense. The judge rejected Verizon's ordinary-course defense.

The parties cross-appealed the split ruling to the district court. The judge affirmed the new-value ruling and denied Verizon's cross-appeal as moot. Cross-appeals to this court followed.

## II. Discussion

We review the legal conclusions of the lower courts de novo and the bankruptcy judge's factual findings for clear error. *In re Kempff*, 847 F.3d 444, 448 (7th Cir. 2017). The trustee asks us to reverse the new-value ruling, arguing that OneStar's assignment and assumption agreement with IceNet effectively repaid MCI for the new value it had provided. The trustee also contends that the bankruptcy judge's use of the per diem method to calculate new value was improper. Verizon's cross-appeal is essentially protective; it seeks reversal of the bankruptcy judge's ordinary-course ruling if it loses its new-value defense. A cross-appeal was unnecessary; the prevailing party can defend its judg-

ment on appeal with any argument that has been preserved for decision. *See, e.g., Mass. Mut. Life Ins. Co. v. Ludwig*, 426 U.S. 479 (1976).

Payments made by a debtor to a creditor in the 90 days before the debtor's bankruptcy filing are classified as preferences by § 547 of the Bankruptcy Code. With certain exceptions § 547 allows the bankruptcy trustee to avoid preferential payments; that is, to recapture them for the bankruptcy estate.

The idea is to prevent debtors from circumventing the Code's scheme of equitable distribution by sending nonordinary payments to a particular creditor shortly before insolvency. A creditor that the debtor favors shouldn't receive more than it otherwise would in liquidation. The same goes for a prescient creditor that perceives the impending bankruptcy and pressures the distressed debtor into paying it beforehand. *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1032 (7th Cir. 1993). Moreover, avoidance of preferences eliminates the potential incentive for creditors to race to collect their debts when a debtor begins to struggle. *In re Milwaukee Cheese Wis., Inc.*, 112 F.3d 845, 847–48 (7th Cir. 1997). A racing creditor might start something like a bank run, unhorsing a debtor trying to regain its footing.

But the creditor resolves those concerns if, having received a preferential transfer, it subsequently replenishes the debtor's coffers. In that scenario the parties are back to where they started—the creditor has effectively returned the preferential transfer. *Unsecured Creditors Comm. of Sparrer Sausage Co. v. Jason's Foods, Inc.*, 826 F.3d 388, 397 (7th Cir. 2016). For that reason § 547(c)(4) excepts a preferential transfer from avoidance "to the extent that, after such trans-

fer, [the] creditor gave new value to or for the benefit of the debtor." In other words, the creditor's preference liability is reduced by the amount of subsequent new value it advanced.

Section 547 also contains an exception to that exception. If the debtor pays for the creditor's new value (and that payment isn't itself avoidable), then the new value is canceled out. That leaves only the preferential payment that § 547 is designed to address in the first place. Accordingly, the Code disallows the new-value defense when "on account of" the new value, the debtor responds with "an otherwise unavoidable transfer to or for the benefit of [the] creditor." § 547(c)(4)(B). That is, the new value must remain unpaid in order to reduce the creditor's preference liability. *Jason's Foods*, 826 F.3d at 397.

The exception to the exception doesn't apply here because OneStar's assignment of debt to IceNet wasn't a "transfer to or for the benefit of" MCI. OneStar's debt was assigned, not discharged. The assignment and assumption agreement was nothing more than a mechanism for OneStar to avoid its creditors. Its only real effect was to place IceNet between MCI and OneStar as a pass-through intermediary.

The trustee suggests that the agreement must have benefited MCI somehow or else MCI wouldn't have agreed to it. Of course anything that stalled OneStar's other creditors or otherwise increased OneStar's chances of remaining solvent indirectly benefited MCI as a creditor. But § 547(c)(4)(B) plainly doesn't reach so far as to encompass any transfer that might improve the debtor's financial outlook. Incidental benefit isn't enough; the transfer must itself be for the creditor's benefit. And the transfer must occur "on account of"

the creditor's new value. That phrase indicates a causal relationship. *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 450–51 (1999). No causal relationship exists between MCI's new value and OneStar's debt assignment. The reasons for the assignment and assumption agreement were entirely unrelated to the new-value services MCI provided. Accordingly, we conclude, as did the lower courts, that MCI's new value remained unpaid.

That leaves the question whether the bankruptcy judge's per diem calculations amounted to clear error in his dating of MCI's new-value advances. Timing matters in § 547(c)(4). As we've observed, the provision prevents the trustee from avoiding a preferential transfer only when new value was advanced "*after* such transfer." (Emphasis added.) Here the temporal inquiry is complicated a bit by the fact that we don't know precisely when all the new value was advanced. MCI billed OneStar on a monthly rather than daily basis and it charged switched services at a variable rate, so we know the amount of services MCI provided only as of the first day of each month.

The bankruptcy judge resolved this problem by allocating each month's credit on a per diem basis to each day of the month. That is, the judge divided each month's total credit by the number of days in the month and assigned the quotient to each day of that month. The parties agree that this raises no issue regarding OneStar's October and November 2003 payments because MCI advanced enough new value after those months to cover the payments.

But the trustee argues that OneStar's two December 2003 payments—$100,000 on December 9 and $200,000 on

December 17—are avoidable because MCI was unable to prove that it advanced new value after those dates. We know that MCI provided OneStar with services worth approximately $1.1 million in December 2003; we just don't know how much of that came at any given time of the month.[1] So it's theoretically possible that the new value advanced by MCI in December came *before* OneStar's December 9 and 17 payments.

Theoretically possible but highly improbable. MCI's new value failed to cover those payments only if it advanced more than $800,000 of the $1.1 million by December 9 or more than $900,000 of the $1.1 million by December 17. In other words, MCI provided enough subsequent new value to cover OneStar's payments unless the December new value was *extremely* front-loaded to the beginning of that month.[2]

The trustee gives us no reason to think that it was, and two facts suggest that extreme front-loading did not occur. First, a portion of MCI's services carried fixed charges,

---

[1] From December 23 to December 31, MCI provided the services to IceNet, which relayed them to OneStar. The bankruptcy judge concluded that those services were advanced "for the benefit of" OneStar, and the trustee doesn't challenge that conclusion. *See* 11 U.S.C. § 547(c).

[2] To look at it another way, consider that the per diem amount for December 2003 was $36,404.62 (arrived at by dividing the total value advanced in December, which was $1,128,543.14, by 31). If the services were evenly distributed across the month, MCI advanced more than $800,000 in new value after December 9 ($36,404.62*22) and more than $500,000 after December 17 ($36,404.62*14). At both dates that's more than double the amount necessary to cover OneStar's payments. Presumably the services weren't evenly distributed across the month, but the point is that only an extremely wide margin of variation could have left insufficient new value to cover the December payments.

making large fluctuations in total charges less likely. Additionally, OneStar's revenue declined only slightly between December 2003 and January 2004 (from $2.5 million to $2.2 million), which suggests that OneStar's use of switched services didn't plummet dramatically in the middle of December.

There's no reason to think that the per diem method misallocated new value in a manner that disadvantaged the trustee, so the bankruptcy judge's use of that method was reasonable. Because MCI advanced enough subsequent new value to cover all the preferential transfers it received from OneStar, the payments are unavoidable.

AFFIRMED.